IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
        vs                              No. 04-176

FREDERICK H. BANKS,
                    Defendant.

_____

        Transcript of proceedings held on Wednesday,
November 20, 2013, United States District Court, Pittsburgh,
Pennsylvania, before the Honorable Joy Flowers Conti, U.S.
District Court Chief Judge.

APPEARANCES:

For the Government:          ROBERT CESSAR, Esq.

For the Defendant:           FREDERICK H. BANKS, pro se
                             PATRICK NIGHTINGALE, Esq.

Court Reporter:              Shirley Ann Hall, RDR, CRR
                             6260 U.S. Courthouse
                             Pittsburgh, PA 15219
                             (412) 765-0408

Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

\* \* \* \* \*

1   (In open court.)

2   THE COURT:  Good morning, please be seated.

3   This is a continuation of a hearing on a violation

4   of conditions of supervised release.  It's in the criminal

5   matter United States versus Frederick H. Banks, Criminal No.

6   04-176.

7   Would counsel please re-enter your appearance.

8   MR. CESSAR:  For the United States, Robert Cessar.

9   DEFENDANT BANKS:  Frederick Banks.

10  MR. NIGHTINGALE:  Your Honor, Patrick Nightingale as

11  either standby counsel or counsel depending on the outcome of

12  the competency hearing.

13  THE COURT:  Presently you're here as counsel.

14  The Court at the conclusion of the prior date for

15  this hearing had determined that there was a need for a

16  psychiatric evaluation to assess the Defendant's ability to

17  represent himself since he was requesting that he be able to

18  represent himself.  The Court has received the report of the

19  psychiatrist which, in summary, opines that he is competent to

20  represent himself under these circumstances in this particular

21  situation.

22  So at this stage have all parties had an opportunity

23  to review that report?

1          MR. NIGHTINGALE:  Your Honor, I've reviewed the

2     conclusions of the report with Mr. Banks but have not provided

3     him with a copy of it for his entire review since we got it

4     yesterday afternoon.

5          THE COURT:  Do you need to review it?

6          DEFENDANT BANKS:  Yes, and I would like a copy of

7     everything I filed in this case.

8          THE COURT:  I'm sorry, a copy of what?

9          DEFENDANT BANKS:  Every motion that I put in in the

10    case because I don't have copies in the prison, and the

11    prosecutor has that information but he doesn't have a copy.

12    He only has one.

13         THE COURT:  I don't know what you're talking about.

14         MR. CESSAR:  Maybe I can clarify.  Mr. Banks --

15    before the hearing began, Mr. Nightingale indicated to me that

16    Mr. Banks did not have copies of what he filed.  In

17    preparation of the hearing -- I only have one copy, but I told

18    Mr. Nightingale I would get copies made and get them to

19    Mr. Banks.  It's not going to happen today because it's -- you

20    know --

21         THE COURT:  Many of them have been denied because --

22    he had counsel at the time, so he's going to have to re-submit

23    some of them.  I think there's only two pending motions at

24    this stage.

25         MR. CESSAR:  So to the extent I'm able to at some

1    point make copies for him, I will.  If he needs to look at

2    them now in court, I have them available for him to look at in

3    court.  I'm trying to be courteous, Your Honor, so there's no

4    issue on appeal.

5            DEFENDANT BANKS:  I need to look at them in court

6    and hopefully get copies.  I sent a letter and never got

7    copies.

8            THE COURT:  Sent a letter to who?

9            MR. NIGHTINGALE:  He sent me a letter saying I want

10   copies of these in court.  As counsel, I reviewed the exhibits

11   and I didn't bring them because it was voice-to-skull Internet

12   printouts and pictures that he drew, and I didn't think it was

13   relevant for the proceeding.

14           DEFENDANT BANKS:  That's not what I asked,

15   Your Honor.  I asked for everything I filed in court --

16           THE COURT:  It's been resolved; Mr. Cessar said he's

17   going to make copies of those for you.

18           DEFENDANT BANKS:  Thank you.

19           THE COURT:  Okay?  All right.  Do you need a moment

20   to review this psychiatric report?

21           DEFENDANT BANKS:  I don't believe I do because

22   you're saying that I can represent myself, correct?

23           THE COURT:  Well, I have more questions to ask you.

24   But this report says in terms of the evaluation that --

25           MR. CESSAR:  Page 8, Your Honor, at the bottom.

1          THE COURT:  I'll get to that -- it says:  Based upon

2     the available information, it's my psychiatric opinion with

3     reasonable psychiatric certainty that the Defendant is

4     suffering from a mental disease in the form of a psychotic

5     disorder not otherwise specified or chronic paranoid

6     schizophrenia.  Either disorder is a major mental disorder of

7     psychotic proportions.  However, it is further my opinion that

8     the disease does not render him unable to waive his right to

9     counsel and proceed pro se in this matter.  He has intact

10    cognitive functioning in many respects, especially outside of

11    the area of the electronic harassment.  And it goes on.

12         So essentially the opinion is that you are competent

13    to waive your right to counsel and to proceed pro se.

14         DEFENDANT BANKS:  Okay.  I don't agree with the

15    report, Your Honor.  The last three doctors I seen all gave me

16    a clean bill of health.  There's two doctors I seen, this guy

17    and a woman in prison, who said there was something wrong with

18    me.

19         There's nothing wrong with me.  He has an exhibit

20    that I sent to the Court, same thing like in the Iraq war.

21    You had the US military, the army -- I don't know if you

22    remember this; it was called Desert Storm.

23         THE COURT:  Here at this stage you have noted that

24    you don't agree with all of the conclusions here in terms of

25    the diagnoses that were being reported by Dr. Wettstein.

1    Dr. Wettstein is present here today.  Do you wish to question

2    him or does the Government wish to question him?

3            MR. CESSAR:  Your Honor, the Government had not

4    anticipated questioning him and we would rely upon the

5    statements in the report.  For the record, we would request

6    that the report be admitted into evidence but placed under

7    seal.  I guess that would be the proper procedure, not

8    publicly available, so the court record is protected and all

9    the parties present are protected.

10          DEFENDANT BANKS:  Your Honor, I just want to put

11    something on the record if I could.

12          THE COURT:  I'm sorry?

13          DEFENDANT BANKS:  I just want to put something on

14    the record if I could.

15          THE COURT:  Sure.

16          DEFENDANT BANKS:  Just like in the Iraq war, Desert

17    Storm, when you had the army -- and this is one of my

18    exhibits.  This is what I'm saying he has and I don't have a

19    copy right now; it's right in that pile.  You have the army

20    using a device where they -- they hit it and it hit the Iraqi

21    troops, and we heard that all these Iraqi troops surrendered

22    and we didn't lose one American life.

23          That device -- and I can't remember the name of it;

24    it's in that report -- makes you feel disoriented.  None of

25    those -- nobody here is saying that those Iraqi soldiers were

1   psychotic.  That's the same feeling that I was complaining of

2   in a separate civil matter that was brought into this criminal

3   case.  I said the US Government has this technology since the

4   '70s, and I cited to the case Sims versus CIA.  And there is a

5   Supreme Court case on it, CIA versus Sims, on the MK Ultra.

6         What I said was that the feeling -- I'm not

7   psychotic.  The US Government has this technology.  The army

8   has used it against Iraqi soldiers and it's codified in CIA

9   versus Sims which is a Supreme Court case.  That's my

10   objection.

11         So the entire report, I think it's hogwash.  There's

12   nothing wrong with me.  I've seen -- I've seen three -- I've

13   seen five doctors; three of them said there's nothing wrong

14   with me.

15         THE COURT:  Okay.  I'll note your objection.

16         I'm going to ask if Dr. Wettstein would please come

17   forward to be sworn.  I have a question to ask him.

18         MR. CESSAR:  I was going to suggest the same thing.

19   If the report is not admitted over the Defendant's examining

20   objection, we need to have Dr. Wettstein.

21         DEFENDANT BANKS:  Can I see my exhibits?  I need

22   them for this.

23         MR. CESSAR:  How about please?

24         DEFENDANT BANKS:  Please.

25         MR. CESSAR:  Okay.

R. Wettstein - Direct

1       DEFENDANT BANKS:  I appreciate it.

2       THE COURT:  Okay.

3                    *  *  *  *  *

4       ROBERT WETTSTEIN, a witness herein, having been

5  first duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7       THE COURT:  Thank you, Dr. Wettstein.  Would you

8  please take the stand.

9       THE WITNESS:  Sure.

10      MR. CESSAR:  Do you want me to conduct the

11  examination or the Court?

12      THE COURT:  You can start if you'd like.

13  BY MR. CESSAR:

14  Q      Okay.  Would you please state your name for the record?

15  A      Yes, Robert Wettstein, W-E-T-T-S-T-E-I-N.

16  Q      And were you engaged by the Court to conduct an

17  examination of the mental competency of Mr. Frederick Banks to

18  waive counsel and represent himself in this proceeding?

19  A      I was.

20  Q      And could you please briefly state your background,

21  education, experience, and what would qualify you as an expert

22  in the field of psychiatry.

23  A      I'm a licensed physician in Pennsylvania.  I have been

24  a psychiatrist since 1981.  I've been trained as a forensic

25  psychiatrist and I've practiced clinical psychiatry and

R. Wettstein - Direct

1  forensic psychiatry since that time.  I've conducted

2  enumerable examinations in criminal cases on behalf of

3  Defendants, prosecutors and courts with regard to competency

4  issues.

5  Q     And have you done so multiple times in this court?

6  A     Yes.

7  Q     And have you been accepted as an expert on those

8  multiple occasions?

9  A     Yes.

10        MR. CESSAR:  I tender Dr. Wettstein as an expert in

11  the matter of psychology and what he's going to testify in.

12        THE COURT:  Psychiatry.

13        MR. CESSAR:  Psychiatry.

14        THE COURT:  Mr. Banks -- excuse me, Mr. Nightingale?

15  You're still his counsel.

16        MR. NIGHTINGALE:  I have no questions and stipulate

17  to Dr. Wettstein's qualifications as an expert in the field of

18  psychiatry.

19        DEFENDANT BANKS:  I object.

20        THE COURT:  Okay.  You may continue.

21  BY MR. CESSAR:

22  Q     And, sir --

23        THE COURT:  He's so recognized.

24        MR. CESSAR:  I'm sorry, Your Honor.

25

R. Wettstein - Direct

1   BY MR. CESSAR:

2   Q      And, sir, have you prepared a report based upon your

3   examination of Mr. Banks?

4   A      Yes, I have.

5   Q      And do you have a copy of that report there, sir?

6   A      I do.  I have one in front of me.

7   Q      Okay.

8          MR. CESSAR:  I have a copy, but it's my only copy,

9   marked as Government 1; I will tender at the end of the

10  examination, Your Honor.

11         THE COURT:  Okay.

12         MR. NIGHTINGALE:  No objection.

13  BY MR. CESSAR:

14  Q      Is that report dated November 17th, 2013?

15  A      Yes, it is.

16  Q      And, in summary, what did you look at and what was your

17  methodology in the report?

18  A      The Court provided me with several documents relating

19  to the specific issue that we're dealing with today, and I

20  enumerated these on the first page of my report, and they

21  include a previous presentence investigation report, the

22  underlying conviction, some Federal Bureau of Prison

23  psychology data sheets which address clinical issues with

24  regard to the Defendant.  I looked at the transcript of a

25  hearing that was held in this courtroom on

R. Wettstein - Cross

1   October 25th regarding this matter, and I looked at some of

2   the documents relating to the petition for the violation.

3       The Defendant had filed a previous civil complaint in

4   the central -- in the Middle District of Pennsylvania, and I

5   looked at that document with the attachments from

6   August 5th, 2013.  And, finally, I interviewed the Defendant

7   on November 15th here in this building.

8   Q    And based upon your interview, your review of the

9   documents, and your mental status examination, what were your

10  conclusions as to the competency of Mr. Banks to waive counsel

11  and represent himself pro se in this hearing?

12  A    As the Court indicated briefly, I did conclude that the

13  Defendant has a serious mental disorder, but that it does not

14  render him unable to waive his right to counsel and proceed

15  pro se even in the absence of current psychiatric treatment.

16       MR. CESSAR:  Your Honor, I would -- do you have any

17  questions of this witness?

18       THE COURT:  My only question I have -- first I think

19  from counsel.

20                   CROSS EXAMINATION

21  BY MR. NIGHTINGALE:

22  Q    Dr. Wettstein, how long was your examination of

23  Mr. Banks at the US Marshal's office?

24  A    Two and three-quarters hours.

25  Q    And do you believe that that examination was long

R. Wettstein - Cross

1   enough to complete your purposes, to determine or evaluate

2   Mr. Banks's competency to waive counsel?

3   A      I do.

4   Q      Now, it was your diagnoses that Mr. Banks suffered from

5   paranoid schizophrenia or otherwise a major psychotic

6   diagnoses.  Mr. Banks disputes that.  Can you tell this Court

7   how you came to the conclusion that Mr. Banks suffers from a

8   mental impairment?

9   A      Yes, I can do that.  The previous documents I referred

10  to from the Federal Bureau of Prisons, the psychology

11  evaluations and psychiatry evaluations indicated such a

12  diagnosis in the first place.  They had prescribed him

13  antipsychotic medication in the first case of Risperdal, which

14  he had apparently taken briefly and then discontinued taking.

15  So there was a history going back to 2012 of such a diagnosis.

16  Q      Did you have the opportunity to review any documents,

17  any medical records indicating that, in fact, there was no

18  mental health diagnoses as Mr. Banks claims?

19  A      I did not see them.

20         DEFENDANT BANKS:  Objection.

21         THE COURT:  Mr. Banks, you're not able to represent

22  yourself yet.  After I make the determination about that, then

23  you'll be able to represent yourself.  At this stage if you

24  want to meet with your attorney, you can do that.  You can ask

25  the Court's indulgence to have Mr. Nightingale speak with you

R. Wettstein - Cross

1  briefly if you'd like.

2          DEFENDANT BANKS:  Yeah.  Let me speak with him,

3  please.

4          THE WITNESS:  So could I finish my response to the

5  question?

6          THE COURT:  Yes, and then Mr. Banks will be able to

7  speak with his counsel.

8          THE WITNESS:  I did not see any documents that said

9  that the Defendant had no mental disorder.

10         (Off the record discussion.)

11 BY MR. NIGHTINGALE:

12 Q      Hypothetically speaking, Doctor, had my client claimed

13 that he had never been given a mental health diagnosis or

14 found to be not suffering from a mental defect, did you see

15 any medical records that would corroborate that?

16 A      No.

17 Q      Do you -- it's your testimony that my client is in need

18 of mental health treatment and medication, is that correct?

19 A      Yes.

20 Q      Do you believe that his lack of medication or refusal

21 to acknowledge his need for medication impairs his ability to

22 represent himself and to effectively answer the Government's

23 charges?

24 A      Essentially, no, although the medication might be

25 helpful to him in managing the stresses of such proceedings.

R. Wettstein - Cross

1  Q      So in the absence of that medication or with my client

2  persisting that he does not have a mental health diagnosis,

3  how can you tell this Court that he is able to proceed and

4  represent himself and defend himself against these charges?

5  A      For several reasons.  And if I can explain --

6  Q      Please do.

7  A      -- the area of -- the area in his mind of the illness

8  is not directly related to the present proceedings and -- in

9  other words -- and this is true in many individuals who have

10  such a condition -- they can function in certain areas of

11  their lives and have impairments in other areas of their

12  lives.  So there's certain preserved, intact areas of

13  functioning that he has that aren't going to directly relate

14  to the particular case here.

15  Q      Okay.  So would it be fair to say that in the mind of

16  an individual with a condition such as Mr. Banks, they can be

17  very high functioning in one respect but also impaired because

18  of their mental health disorder in another respect?

19  A      Yes, that is accurate.

20  Q      And it's your review of Mr. Banks's medical history,

21  his filings and your interview of Mr. Banks that leads you to

22  this conclusion; is this correct?

23  A      Yes.

24  Q      And is that conclusion within a fair degree of

25  psychiatric certainty?

A      Yes, it is.

DEFENDANT BANKS:  If I may have a moment, Your Honor?

THE COURT:  Yes.

(Off the record discussion.)

MR. NIGHTINGALE:  I have nothing further, Your Honor.  Thank you.

THE COURT:  Is there anything you've heard in court here today that would change your opinion?

THE WITNESS:  No.

THE COURT:  Thank you.

Anything further?

MR. CESSAR:  From the Government, no, Your Honor.

THE COURT:  You're going to move to admit the report under seal?

MR. CESSAR:  Yes, under seal.

THE COURT:  Okay.

DEFENDANT BANKS:  No objection, to the extent --

THE COURT:  It will be admitted.

Thank you, Dr. Wettstein.  You're excused.

THE WITNESS:  All right, thank you.  Did you want me to wait and be present for some of the subsequent proceedings to determine if there's a problem?

THE COURT:  Yes, please stay.

THE WITNESS:  Okay.

1        MR. NIGHTINGALE:  Your Honor, my client just advised
2   me he would like me to ask Dr. Wettstein another question or a
3   series of questions.
4        THE COURT:  All right.
5        MR. NIGHTINGALE:  And if we could open the record
6   back up on that portion of the proceedings.
7        THE COURT:  Sure.
8        (Off the record discussion.)
9        MR. NIGHTINGALE:  Your Honor, my client has asked me
10  to inquire of Dr. Wettstein for him to summarize the contents
11  of a wired.com article that has been the subject of numerous
12  proceedings.  I don't think it's relevant.  To the extent that
13  I'm counsel of record, I will not ask that question because
14  it's irrelevant to the issue of competency.
15        DEFENDANT BANKS:  Your Honor, can I say something,
16  please?
17        THE COURT:  No, not at this stage to the extent
18  you're going to be inquiring about some other kind of record
19  that the doctor -- that's not within his area of expertise.
20        MR. NIGHTINGALE:  So that the record is complete,
21  one of the documents that Dr. Wettstein referenced was the
22  civil complaint filed by Mr. Banks.  That civil complaint
23  includes a wired.com article allegedly involving
24  voice-to-skull technology and MK Ultra and voice of God weapon
25  or whatever Mr. Banks believes the Government is utilizing

1   against him.  He wants me to ask Dr. Wettstein to summarize

2   that article and presumably follow up with questions about

3   voice-to-skull technology.  I believe that that is irrelevant

4   and --

5          THE COURT:  Dr. Wettstein, do you have any expertise

6   in voice-to-skull technology?

7          THE WITNESS:  I do not.

8          THE COURT:  He won't be able to answer those

9   questions.

10         MR. NIGHTINGALE:  I have nothing further.

11         THE COURT:  Okay.

12         Thank you.  If you could please stay; thank you.

13         THE WITNESS:  Thank you.

14         (Whereupon, the witness was excused.)

15         THE COURT:  If you could please come forward.

16         (Defendant Banks and Mr. Nightingale come to

17   podium.)

18         THE COURT:  I'm going to have you re-sworn,

19   Mr. Banks.  Would you please raise your right hand.

20                    * * * * *

21         FREDERICK BANKS, the Defendant herein, having been

22   first duly sworn, was examined and testified as follows:

23         THE COURT:  Okay.  I believe we left off when I was

24   questioning you with respect to determining your competency to

25   waive your right to counsel and to proceed to represent

1    yourself pro se.  I had asked:  Have you -- are you now or

2    have you recently been hospitalized or treated for narcotic

3    addiction or mental illness of any kind other than what you've

4    told us about, the time that you were in the Bureau of Prisons

5    and they had diagnosed you with paranoid schizophrenia.  And

6    you had, I think you said, one time taken the medication.

7    Other than that --

8            DEFENDANT BANKS:  No.

9            THE COURT:  -- have you had any other treatment or

10   hospitalization?

11           DEFENDANT BANKS:  No.  I took -- the one time I took

12   the medication as explained, I passed out, hit my head on the

13   floor.  They pulled me into the lieutenant's office.  I was

14   never treated and -- you know, they prescribed me this

15   medication that I didn't need.  The one time I took it I

16   collapsed.  So, no, I never -- I haven't had any treatment

17   since.

18           THE COURT:  Since then; and no treatment for

19   narcotic addiction?

20           DEFENDANT BANKS:  Well, I had the -- you know, had

21   the -- not narcotics, but alcohol.  I had the RDAP,

22   Residential Drug Abuse Program, and I had the 40-hour

23   residential program.  I had the new residential program, and I

24   think there was one more.  But I had like three or four drug

25   programs, the 500-hour you recommended, and I took that when I

1    was in Forest City, and I completed that.

2             THE COURT:  Okay, thank you.  But you completed all

3    those programs?

4             DEFENDANT BANKS:  I completed them all.  I didn't

5    complete -- I completed the -- they called it the unit based

6    portion of RDAP, which is the portion you complete in prison.

7    Then I went to the halfway house and they sent me back, which

8    you probably already know, so I didn't complete the -- it's

9    called TDAP, which is the second like part when you get to the

10   halfway house; but I completed the 500 hours in the prison.

11            THE COURT:  Okay.  Do you understand what's

12   happening today?

13            DEFENDANT BANKS:  Yes.

14            THE COURT:  Do you understand that you're -- you are

15   presently considering waiving your right to counsel and

16   proceeding pro se for the proceedings with respect to the

17   violation of conditions of supervised release which was

18   imposed in connection -- as part of the sentence in Criminal

19   No. 04-176?

20            DEFENDANT BANKS:  Yes.

21            THE COURT:  Okay.  The Court has had the benefit of

22   the report from Dr. Wettstein.

23            Mr. Nightingale, Mr. Conway, do either of you have

24   any doubt about the Defendant's competence to waive his right

25   to counsel and to proceed pro se?

1           MR. CESSAR:  Mr. Cessar or --

2           THE COURT:  I'm sorry; Mr. Cessar.

3           MR. CESSAR:  But -- based upon the report, no.  But

4    based upon my personal observation, I still question; but I

5    have to rely upon the report of the expert psychiatrist.

6           MR. NIGHTINGALE:  We certainly defer to

7    Dr. Wettstein's expert report.  He's much more qualified than

8    I am, though I would share in Mr. Cessar's opinion regarding

9    personal observations and opinion.

10          DEFENDANT BANKS:  May I make the -- a statement

11   myself, Your Honor?  As you know, I represented myself in

12   front of you during the criminal case.

13          THE COURT:  Yes, you did.

14          DEFENDANT BANKS:  And the Government sought to

15   upward depart.  You -- and the motion was denied based on my

16   representation of myself.  In the first matter I had with the

17   attorney, who I will not mention his name, in front of

18   Judge Hardiman, I was guilty in 45 minutes.  And in the case I

19   represented myself in front of you, it took the jury three or

20   four days to deliberate, plus I saved myself two years because

21   you denied the motion to upward depart.  I believe if I would

22   have had counsel, I would have been doing an extra two years

23   in prison.

24          THE COURT:  Okay.  The Court finds the Defendant

25   competent to waive his right to counsel and proceed pro se

1    based upon his answers to the Court's questions and, most

2    particularly, the report and the testimony of Dr. Wettstein.

3              Now, Mr. Banks, are you aware that you have a

4    constitutional right to be represented by an attorney at every

5    stage of the proceedings against you?

6              DEFENDANT BANKS:  Yes.

7              THE COURT:  Do you understand you do not have to

8    waive your right to an attorney or to proceed pro se?

9              DEFENDANT BANKS:  Yes.

10             THE COURT:  In other words, do you understand that

11   you have a right to an attorney?

12             DEFENDANT BANKS:  Yes.

13             THE COURT:  Do you understand that if you are unable

14   to afford an attorney, the Court, as it has, will appoint one

15   without cost to you?

16             DEFENDANT BANKS:  Yes.

17             THE COURT:  Knowing those rights, do you still wish

18   to proceed pro se in connection with these proceedings against

19   you?

20             DEFENDANT BANKS:  Yes.

21             THE COURT:  Have you ever studied law?

22             DEFENDANT BANKS:  Yes.

23             THE COURT:  And how have you done that?

24             DEFENDANT BANKS:  I took a correspondence course

25   when I was in prison, as to paralegal, and I took law courses

1    at Brigham Young University through correspondence, and been

2    litigating for the past ten years helping inmates, many of

3    which I helped them get out of prison.

4         One particular case, Jeffrey Alan Smith.  The case

5    is called In re: Gary Warren, disciplinary proceedings out of

6    Texas.  Based on the case that I filed for Jeffrey Alan Smith,

7    he was disbarred because he lied to the Court.  There is

8    another case in which I helped a guy named Andrew Hanson

9    depose a judge.  So there's a lot of cases that I've -- that

10   I've helped people, and I -- I believe that I'm the only one

11   who can effectively represent myself.

12         THE COURT:  Okay.  But you do understand that you

13   have not studied law in the same way an attorney who is

14   licensed to practice law has had to do.

15         DEFENDANT BANKS:  Well, I mean I've read one author,

16   which is Scott Turow.  I believe he wrote the book, and it's

17   about his first year at Harvard.  And I read the book.  It

18   took me a couple days, and I knew 99.9 percent of the stuff he

19   was talking about in that, so I think I can represent myself

20   effectively, better than an attorney could.

21         THE COURT:  And the Court recognizes -- because you

22   represented yourself in a criminal action before me, so I'm

23   aware that you have represented yourself in a criminal action;

24   correct?

25         DEFENDANT BANKS:  Yes.

1          THE COURT:  And do you understand the violations of

2    the conditions of supervised release with which you are

3    charged?

4          DEFENDANT BANKS:  Yes, but I'm a little bit confused

5    as to if we're proceeding on both petitions or not because

6    just some discussions I had with Mr. Nightingale downstairs,

7    there's two petitions.  There's a petition and then there's a

8    supplemental petition.

9          THE COURT:  Both.

10          DEFENDANT BANKS:  Okay.

11          THE COURT:  Do you understand that?

12          DEFENDANT BANKS:  Yes.

13          THE COURT:  Okay.  And do you understand that you

14    are charged with committing a federal, state, or local crime

15    which under the guidelines would be a Grade B violation; and

16    you're also charged with incurring new credit charges or

17    opening additional lines of credit without the approval of the

18    probation officer, which would be required unless you were in

19    compliance with the installment payment schedule, and that is

20    a Grade C violation.

21          Do you understand that?

22          DEFENDANT BANKS:  Right.  But on the first petition,

23    it's an allegation.

24          THE COURT:  Well, that's all they are.  These are

25    charges.

1      DEFENDANT BANKS:  Yes.

2      THE COURT:  And do you understand that if the Court

3 determines by a preponderance of the evidence -- keep in mind

4 this is not like the trial of the charged -- the criminal

5 charges, which is beyond a reasonable doubt.  Because these

6 are violations of the conditions of supervised release, the

7 determination is made by the Court.  It's not made by a jury

8 and it's by a preponderance of the evidence.  And that's what

9 will happen when the Court proceeds to determine whether or

10 not you violated the conditions of your supervised release.

11      You understand that.

12      DEFENDANT BANKS:  I believe on the first petition

13 that I have to be convicted for the Court to violate and --

14      THE COURT:  The Court only needs to find probable

15 cause that you violated that, and that finding is by a

16 preponderance of the evidence.

17      DEFENDANT BANKS:  Okay.  Well, I have two cases --

18      THE COURT:  You understand what that is, the

19 standard of the law?

20      DEFENDANT BANKS:  I have two cases that the US

21 Probation in this district filed in court, one in front of

22 Gary Lancaster and the other in front of Alan Bloch, where

23 they filed the petition after the guy was convicted; so I

24 would object on equal protection grounds because --

25      THE COURT:  I'm not there yet.  I'm telling you what

1   the standards are that are going to be applied.  You can

2   object at the time of the hearing on the violations, but these

3   are the standards.

4          Do you agree, Mr. Cessar, that I've correctly set

5   forth what standards would be applicable?

6          MR. CESSAR:  Yes, Your Honor.

7          THE COURT:  Mr. Nightingale, do you have any

8   question about those standards?

9          MR. NIGHTINGALE:  No, Your Honor.

10         THE COURT:  Have I omitted anything?

11         MR. NIGHTINGALE:  No, you've not.  You've accurately

12  stated the law, Your Honor.

13         THE COURT:  And you understand, Mr. Banks, that the

14  maximum penalty -- if the Court determines that your

15  supervised release should be revoked and determines a term of

16  imprisonment would be appropriate, that the maximum penalty

17  would be a term of imprisonment of not more than two years?

18         DEFENDANT BANKS:  Yes, I understand that.

19         THE COURT:  Now, do you understand that the Court

20  can revoke the supervised release or could modify the

21  conditions of the supervised release or extend the period of

22  supervised release if violations are found?

23         DEFENDANT BANKS:  Yes.

24         THE COURT:  And do you understand that there are

25  advisory sentencing guidelines that the Court will consider in

1    determining if the supervised release is to be revoked?   What
2    that -- the Court will consider those in determining the
3    sentence that could be imposed with respect to these
4    violations.

5            DEFENDANT BANKS:   Yes.

6            THE COURT:   And now do you understand that if you
7    represent yourself, you're on your own?

8            DEFENDANT BANKS:   Yes.

9            THE COURT:   Do you understand that I cannot tell you
10   or advise you how to represent yourself in connection with
11   these proceedings?

12           DEFENDANT BANKS:   Yes.

13           THE COURT:   And do you understand that the Federal
14   Rules of Evidence do not apply at this hearing?

15           DEFENDANT BANKS:   Yes.

16           THE COURT:   The Court from time to time, however,
17   may consider them in determining how to proceed; but the
18   Court -- but there's more flexibility in connection with this
19   type of proceeding.   Do you understand that?

20           DEFENDANT BANKS:   Yes.

21           THE COURT:   Are you familiar with the Rules of
22   Criminal Procedure?

23           DEFENDANT BANKS:   Yes.

24           THE COURT:   How are you familiar with them?

25           DEFENDANT BANKS:   By studying it on my own.

1    THE COURT:  On your own.  Do you understand that
2  those rules govern the way a criminal action is tried in court
3  and that you would be bound by those and that they cannot be
4  relaxed?
5    DEFENDANT BANKS:  Yes.
6    THE COURT:  Now, Mr. Banks, as I advised you in the
7  previous case, which is the underlying case here, I did advise
8  you then and I'm advising you now that in my opinion a trained
9  lawyer would defend you far better than you can defend
10  yourself.  I think it's unwise of you to represent yourself.
11  You're not familiar with the law in the same way a trained
12  lawyer is, you're not as familiar with court procedures as a
13  trained lawyer would be, and you are not as familiar with the
14  Federal Rules of Criminal Procedure as a trained lawyer would
15  be.  I strongly urge you not to represent yourself.
16    Now, in light of the penalties you face, Mr. Banks,
17  and in light of all the difficulties of representing yourself,
18  do you still desire to represent yourself and to give up your
19  right to be represented by a lawyer?
20    DEFENDANT BANKS:  Yes, Your Honor.  And also I'd
21  like to state on your previous question that you said that the
22  Rules of Criminal Procedure are strict and cannot be modified.
23  I do want to put on the record that I am an American Indian.
24  You probably know this already.  We spoke about this ten years
25  ago when I was in front of you.  And all rules, regulations,

statutes and constitutional provisions are construed liberally

in an American Indian's favor, with ambiguous provisions

interpreted to their benefit.  That is a US Supreme Court

case --

THE COURT:  I've already ruled on those matters in

other motions you filed previously.

Now, is your decision entirely voluntary?

DEFENDANT BANKS:  Yes.

THE COURT:  Has anyone forced you in any way to give

up your right to an attorney?

DEFENDANT BANKS:  The only person whoever forced me

to give up a right to anything, if I have them, is

Mr. Livingston in a Hardiman case, who told me be quiet, don't

talk; but that was a different matter, that was the other

case.

THE COURT:  In connection with this proceeding.

DEFENDANT BANKS:  Not this, no.

THE COURT:  Okay.  Based upon the sworn testimony of

Mr. Banks, the Court finds that the Defendant is -- has

knowingly and voluntarily waived his right to counsel, and the

Court will therefore permit the Defendant to represent

himself.

Mr. Nightingale, you are now going to be assuming

the role as standby counsel.

MR. NIGHTINGALE:  Yes, Your Honor.

1          THE COURT:  Now we will go back to the hearing on
2     the violation of the conditions of supervised release.
3          Is the probation officer here today?
4          MR. CESSAR:  Yes.  And I also have an agent from the
5     Federal Bureau of Investigation who will testify.
6          THE COURT:  Okay.
7          Mr. Banks -- before you leave, would the probation
8     officer please enter your appearance for the record?
9          PROBATION OFFICER:  Benjamin Orrison, United States
10    probation officer.
11          THE COURT:  Thank you.
12          Okay.  Mr. Banks --
13          DEFENDANT BANKS:  Yes?
14          THE COURT:  Now, do you understand that, having been
15    sworn, your answers to my questions are subject to the
16    penalties of perjury or of making a false statement if you do
17    not answer truthfully?
18          DEFENDANT BANKS:  Well, I'm not -- that's if I
19    testify, right?  I mean I'm just representing myself.  I
20    wouldn't --
21          THE COURT:  Right, if you testify.  I'm going to ask
22    you questions.
23          DEFENDANT BANKS:  Yeah, okay.
24          THE COURT:  Not in your capacity as a lawyer, but in
25    your capacity as the Defendant.

1    DEFENDANT BANKS:  If I testify, correct.

2    THE COURT:  No, I am going to ask you questions and

3    you need to answer my questions in this hearing.

4    DEFENDANT BANKS:  Okay.  But are you saying if I

5    testify or just --

6    THE COURT:  Answering my questions.

7    DEFENDANT BANKS:  Period, okay.

8    THE COURT:  Okay?

9    DEFENDANT BANKS:  Uh-huh.

10   THE COURT:  Do you understand that?

11   DEFENDANT BANKS:  Yes.

12   THE COURT:  So if you -- if you don't tell the

13   truth, if you make a false statement when I ask you a question

14   and you answer, not in your capacity as the lawyer, but in

15   your capacity as the Defendant, do you understand that you

16   could be subject to the penalties of perjury or of making a

17   false statement?

18   DEFENDANT BANKS:  Yes, uh-huh.

19   THE COURT:  Okay.  Now, Mr. Banks, the Court has

20   been advised that you violated the following conditions of

21   your supervised release.  The first condition is that the

22   Defendant shall not commit another federal, state or local

23   crime.

24   The Court has been advised that on October 1, 2013,

25   the Probation Office was notified that the Defendant allegedly

1  committed wire fraud and aggravated identity theft.  On

2  August 19, 2013, the Defendant allegedly opened an account at

3  Gain Capital Group, LLC, which I'll refer to as Gain Capital,

4  and attempted to deposit three automated clearinghouse

5  deposits into that account.  Gain Capital froze the account

6  when they found -- when it found that the Defendant -- when it

7  learned, I should say, that the Defendant was a convicted

8  felon.

9          Do you understand that is the first violation with

10  which you are charged?

11          DEFENDANT BANKS:  I do understand that.

12          THE COURT:  The second violation is -- relates to

13  the condition that the Defendant shall not incur new credit

14  charges or open additional lines of credit without approval of

15  the probation officer unless the Defendant is in compliance

16  with the installment payment schedule.

17          The Court's been advised that on October -- excuse

18  me, on August 22, 2013, the Defendant allegedly opened a new

19  account under his father's name, Freddie Banks.  Seventy

20  automated clearinghouse deposits were deposited into this

21  account, and the Defendant allegedly began to request

22  withdrawals in various amounts to various bank accounts.

23  Gain Capital conducted an immediate review of these

24  transactions and determined that the Social Security number

25  used to open the account was that of a deceased person.

1   Defendant called a Gain Capital representative on the

2   telephone during the review process to inquire about the

3   status of the withdrawals.  The telephone call was recorded.

4          During the review process conducted by Gain Capital,

5   Defendant sent documents showing that he purportedly had over

6   $2 million in a local bank account.  Additional documents

7   showed a bank account in the name of the Defendant's company,

8   Hexagon, LLC, in the amount of $664,997.83.

9          Do you understand that based upon those allegations

10  you're alleged to have violated the condition that you

11  incurred -- you opened additional lines of credit without the

12  approval of the probation officer?

13          DEFENDANT BANKS:  I do understand that.

14          THE COURT:  Okay.  Now, Mr. Banks, do you admit that

15  you violated these conditions of your supervised release?

16          DEFENDANT BANKS:  No, I don't admit that.

17          THE COURT:  Okay.

18          At this time, Mr. Cessar, it's up to the Government

19  to prove by a preponderance of the evidence that the alleged

20  violations occurred.

21          MR. CESSAR:  Yes, Your Honor.  And one matter I'd

22  like to bring to the Court's attention, Mr. Banks sent me a

23  letter dated November 13th, 2013.  I did not respond.  I

24  don't think it's appropriate that I receive letters from

25  Defendants, but I wanted to make the Court aware that I

1    received such a letter and I did not respond so there's no

2    question of improper ex parte communication.

3              THE COURT:  Okay.

4              Mr. Banks?

5              DEFENDANT BANKS:  I believe the matter is related to

6    an unrelated matter that was concerning a vehicle that I saw

7    apart -- back in the FBI building on the South Side where I

8    live, a vehicle that you ordered them to return, a Ferrari

9    355.  They never returned it.  It's parked in the back lot;

10   you can see all the vehicles down at the South Side Works.

11             THE COURT:  That is not for the purpose of the

12   hearing today.

13             DEFENDANT BANKS:  That's what the letter was about

14   and that's why I brought it up.

15             THE COURT:  That's not for today.

16             MR. CESSAR:  Thank you.

17             DEFENDANT BANKS:  They're saying they don't have it.

18             THE COURT:  Okay.

19             MR. CESSAR:  At this time the Government calls

20   Special Agent Sean Langford.  And, Your Honor, I have a tape

21   I'd like to play that I have set up here, so my technical

22   expertise may require fumbling a few minutes to make sure I

23   get it right.

24             THE COURT:  Okay.

25                       *  *  *  *  *

1          SEAN LANGFORD, a witness herein, having been first

2   duly sworn, was examined and testified as follows:

3                       DIRECT EXAMINATION

4          THE COURT:  Thank you, please take the stand.

5          MR. CESSAR:  Does the Court want me to conduct the

6   examination from the podium or from here?

7          THE COURT:  It's easier for the court reporter if

8   you do so.

9          MR. CESSAR:  Okay.

10  BY MR. CESSAR:

11  Q      Would you please state your name for the record.

12  A      My name is Sean Langford.

13         THE COURT:  I'm sorry?

14         THE WITNESS:  Sean Langford.  L-A-N-G-F-O-R-D.

15  BY MR. CESSAR:

16  Q      And by whom are you employed?

17  A      Federal Bureau of Investigation.

18  Q      And how long have you been so employed?

19  A      Over nine years.

20  Q      And what is your title with the FBI?

21  A      Special Agent.

22  Q      And what are your duties as a Special Agent?

23  A      Investigate federal matters, specifically white collar,

24  complex white collar fraud matters.

25         MR. CESSAR:  Your Honor, I have a series of exhibits

1    for the Court that I've provided to Mr. Banks that I would

2    like to tender to the Court.

3              THE COURT:   Thank you.

4    BY MR. CESSAR:

5    Q      Now, are you the agent assigned to this matter

6    investigating Mr. Banks, in particular his interaction with a

7    company called Gain Capital?

8    A      Yes, I am.

9    Q      And have you engaged in various law enforcement methods

10   including obtaining subpoenaed records, interviewing

11   witnesses, and executing a search warrant?

12   A      That's correct.

13   Q      And based -- did you also review public source

14   information such as databases?

15   A      I did.

16   Q      And have you been able to determine Mr. Banks's Social

17   Security number and his date of birth?

18   A      Yes, I have.

19   Q      What are they?

20             THE COURT:   This will be under seal, the personal

21   identifiers.

22             MR. CESSAR:   Okay.

23             DEFENDANT BANKS:   Can we -- I'm sorry, Your Honor,

24   can I say something real quick?

25             THE COURT:   What's your objection?

1          DEFENDANT BANKS:  I just don't like the last four
2   digits of my Social Security read.
3          THE COURT:  That's what I'm saying, it would be
4   under seal.
5          DEFENDANT BANKS:  This whole courtroom --
6          THE COURT:  Just do the last four digits.
7   BY MR. CESSAR:
8   Q     The last four digits, what are the last four digits?
9   A     6411.
10  Q     And, again, maybe for the date of birth, what year was
11  he born?
12  A     1967.
13         THE COURT:  Thank you.
14  BY MR. CESSAR:
15  Q     And have you reviewed Allegheny County property
16  records?
17  A     Yes, I have.
18  Q     And have you reviewed property records relating to
19  52 South 8th Street, Pittsburgh, PA?
20  A     That's correct.
21  Q     And what do those provide or state?
22  A     The property records, according to Allegheny County,
23  shows 52 South 8th Street is owned by Freddie Banks,
24  F-R-E-D-D-I-E, Banks.
25  Q     And who is Freddie Banks?

1   A      Freddie Banks is Frederick Banks's deceased mother.

2   Q      And have you been able to determine that she passed in

3   approximately December 18th of 2006?

4   A      Correct.

5          DEFENDANT BANKS:  I'm going to object.  Objection,

6   relevance.

7          THE COURT:  There's been an objection on the basis

8   of relevancy.

9          MR. CESSAR:  Your Honor, Mr. Banks opened an account

10  at Gain Capital --

11         DEFENDANT BANKS:  Objection.

12         MR. CESSAR:  -- in the name of Freddie Banks.  This

13  is going to the underlying theory that Freddie Banks was

14  deceased and therefore unable to open the account.  Further,

15  we have a tape in which Mr. Banks identifies himself as

16  Freddie Banks --

17         DEFENDANT BANKS:  Objection.

18         MR. CESSAR:  -- which we're going to play for the

19  Court, so I believe it's relevant.

20         THE COURT:  The Court finds it's relevant.

21         Do you have any further objection?

22         DEFENDANT BANKS:  Yes, I do object.  The way he's

23  battering me -- this is an allegation, Your Honor, I said I

24  did this, I did that.

25         THE COURT:  That was his proffer.  That was a

1    proffer.

2              DEFENDANT BANKS:  Okay, all right.

3              THE COURT:  That's what he said he is going to --

4    the evidence is coming in through the witness and the

5    exhibits.

6              Thank you, you may proceed.

7    BY MR. CESSAR:

8    Q      And have you inquired of postal inspection agents who

9    receives mail at that location?

10   A      I have, and Frederick Banks is the only individual

11   known to receive mail at 52 South 8th Street, Pittsburgh PA,

12   15203.

13             DEFENDANT BANKS:  Objection, that's hearsay.

14             THE COURT:  Hearsay is admissible in this

15   proceeding.

16             DEFENDANT BANKS:  I have a case that states it's

17   not.

18             THE COURT:  It is; you're overruled.

19             DEFENDANT BANKS:  I'd like to preserve that.

20             THE COURT:  You can preserve it.  The objection is

21   noted.

22   BY MR. CESSAR:

23   Q      And have you reviewed the records of the Pennsylvania

24   Bureau of Motor Vehicles for Mr. Banks and does he have an

25   operating license number?

1   A        I have, and he does have a current driver's license

2   with operator license number.

3             DEFENDANT BANKS:  Just the last four digits.

4             THE WITNESS:  The last four digits, 6844.  It was

5   issued on or about December 5th of 2012.

6   BY MR. CESSAR:

7   Q        And does it reflect Mr. Banks's birth date?

8   A        It does, as September 10th of 1967.

9   Q        And what location?

10  A        It shows that he resides at 52 South 8th Street,

11  Pittsburgh, PA, 15203.

12  Q        What is Gain Capital?

13  A        Gain Capital is a online futures and foreign exchange

14  trading house that is located in Bedminster, New Jersey.

15  Q        Could you spell Bedminster for the court reporter?

16  A        Bedminster, B-E-D-M-I-N-S-T-E-R.

17  Q        And did they use something called Forex, F-O-R-E-X,

18  dot-com?

19  A        Yes.

20            DEFENDANT BANKS:  Objection.

21            THE COURT:  What's your objection?

22            DEFENDANT BANKS:  Hearsay.

23            THE COURT:  Overruled.

24  BY MR. CESSAR:

25  Q        What is forex.com?

1    A       Forex.com holds itself out to be one of the largest

2    investment brands in the online foreign exchange.   They

3    operate a Web site, forex.com, where people can -- individuals

4    or corporate entities can open accounts in order to effect

5    trades of futures and foreign exchange of assets.

6    Q       Now, I would like you to look at Government Exhibit 1,

7    sir.  Do you have that before you?

8    A       I do.

9    Q       I'd like to turn the Court's attention to that.  What

10   is that document, sir?

11   A       This is a secure online account application at

12   forex.com that was opened in the name of Mr. Frederick Banks.

13   Q       And did you obtain this from Gain Capital?

14   A       I did.

15   Q       And what is some of the information contained therein

16   such as the name, residence, et cetera?  Could you go through

17   this application?

18   A       Yes, sir.  The name, personal information provided via

19   the Internet to open this forex.com account was opened by

20   Mr. Frederick Banks.  Country of residence listed the

21   United States.  There is an e-mail address provided as

22   FredBanks123@ymail.com.  There is a home phone number provided

23   of area code (412)515-9670.  This is an individual account as

24   opposed to a corporate account.  The address listed for

25   Mr. Frederick Banks was 52 South 8th Street, Pittsburgh, PA,

1    15203.  It lists Frederick Banks as a US citizen with a Social

2    Security number with the last four digits of 6411, and a date

3    of birth of 9-10-1967.  It also shows an employment status as

4    a business professional, with employer's name of Hexagon

5    Records.

6                    DEFENDANT BANKS:  I want to object, Your Honor.

7                    THE COURT:  On what basis?

8                    DEFENDANT BANKS:  On the basis we don't have a

9    representative of Gain or Forex to even tell us this is one of

10   their applications.  I mean I have a right to confront that --

11   that representative under the confrontation clause.

12                   MR. CESSAR:  Your Honor, that's not correct; and the

13   witness has stated he obtained these pursuant to a subpoena

14   and request from Gain Capital, so they are Gain Capital

15   records, which are business records.

16                   DEFENDANT BANKS:  And can I see a copy of the

17   subpoena?  I would like to see it.

18                   THE COURT:  I have never received it.

19                   MR. CESSAR:  You are not required to receive a copy

20   of the subpoena, sir.  It's a matter before the Grand Jury

21   right now.

22                   THE COURT:  It's overruled.

23                   THE WITNESS:  The position held by Mr. Frederick

24   Banks is listed as president of Hexagon Records, and the

25   business address for Hexagon Records is listed as Post Office

1    Box 42303 in Pittsburgh, Pennsylvania, 15203.

2    BY MR. CESSAR:

3    Q      And there is an annual income of Mr. Banks?

4    A      In the financial information of this application it

5    lists that the annual income for Mr. Frederick Banks is over

6    $500,000, also having a net worth of over $5 million.

7    Q      And trading experience in this matter?

8    A      He lists stock and equity trading experience of over

9    three years.

10   Q      And, sir, were you able to subpoena Sprint for

11   telephone number (412)515-9670?

12   A      Yes, sir.

13   Q      Do you see Grand Jury Exhibit 16 there before you?

14   A      I do.

15   Q      What is that?

16          THE COURT:  Is this a Government exhibit?

17          MR. CESSAR:  A Government exhibit.

18          THE WITNESS:  This is Grand Jury subpoena production

19   provided by Sprint pertaining to the cell phone number of

20   (412)515-9670.

21   BY MR. CESSAR:

22   Q      And according to Sprint, who does this number belong

23   to?

24   A      The billing information, account information lists

25   effective May 25th of 2013 that the subscriber to the cell

1    phone is Frederick Banks, residing at 52 South 8th Street,

2    Pittsburgh, PA, 15203.

3    Q       After the forex.com account was opened --

4            DEFENDANT BANKS:  I'm going to object.  I object,

5    Your Honor.

6            THE COURT:  What are you objecting to?

7            DEFENDANT BANKS:  That's not what it says.  It says

8    the account number subscribed to the person is

9    Frederick Banks; this has a different phone number.

10           THE COURT:  I can't hear you.

11           DEFENDANT BANKS:  I'm sorry.  It says -- he said

12   that it says the account number subscribed to is

13   Frederick Banks.  But in that section, account details, it's a

14   different phone number.  It's not the 515; it's a 441 number.

15   So that's not the number it's listed at.  It's listed as the

16   person who has this account saying it's me and the different

17   phone number from the one he's saying.

18   BY MR. CESSAR:

19   Q       Would you clarify this for the record, sir.

20           DEFENDANT BANKS:  Government Exhibit 16.

21           THE COURT:  You can ask him questions on cross

22   examination.

23           DEFENDANT BANKS:  Okay.

24           THE COURT:  Thank you.

25

1  BY MR. CESSAR:

2  Q      Maybe the way to clarify this is did you subpoena

3  Sprint for records relating to Telephone No. (412)515-9670?

4  A      Yes, sir.

5  Q      And based upon those records, does that number come

6  back to Frederick Banks with a billing address of 52 South 8th

7  Street, Pittsburgh, PA?

8  A      Yes.

9         DEFENDANT BANKS:  Objection.

10        THE COURT:  Overruled.

11  BY MR. CESSAR:

12  Q      And, sir, if you could look at Government Exhibit 2,

13  what is that exhibit?

14  A      This is a document that I received from Gain Capital

15  detailing a schedule of electronic deposits into the

16  Frederick Banks forex.com account.

17  Q      And where were those deposits purportedly coming from?

18  A      These were electronically transferred from a First

19  Niagara bank account that ended in the last four digits of

20  0906 purported to be an account owned by Frederick Banks.

21  Q      And could you look at Government Exhibit 19, sir, the

22  next exhibit.

23  A      I have it.

24  Q      What is that, sir?

25  A      These are records obtained of the Grand Jury subpoena

1    from First Niagara Bank detailing the owner and account detail

2    for First Niagra opened in Frederick Banks's name.

3    Q       And what were those accounts, sir?

4    A       There are two accounts.  One account ends in 0906,

5    there was another account ending in 8507.

6    Q       And so we're clear, there were ACH transactions from

7    this account to Gain Capital, Forex?

8    A       Correct.

9    Q       Okay.  And have you had an opportunity -- well, sir,

10   did Gain Capital accept those ACH transfers?

11   A       Yes, they did.  The account was opened.  The ACH

12   deposits were transferred into the Forex trading account.

13   There were four of them.  They totaled approximately $9,000

14   between the four transfers, the First Niagara account 0906

15   into the Forex/Gain Capital account.

16   Q       At some point did Gain Capital receive charges back on

17   those four and close that account?

18   A       They did.

19   Q       And have you reviewed the monthly supervision reports

20   that Mr. Banks completed and submitted to the Probation

21   Office?

22   A       I have.  I have, yes, sir.

23   Q       And are those Government Exhibits 10, 11 and 12?

24   A       Yes, sir.

25   Q       What is Government Exhibit 10?

1   A        Government Exhibit 10 is a monthly supervision report

2   that was received by the US Probation Office on or about

3   August 20th pertaining to Frederick Banks.

4   Q        Government Exhibit 11, sir?

5   A        Also a monthly supervision report submitted and

6   received by the US Probation Office on or about

7   September 17th in relation to Frederick Banks.

8   Q        And what about Government Exhibit 12?

9   A        Exhibit 12 is also a monthly supervision report that

10  was received by the Western District US Probation Office on or

11  about June 20th in relation to Frederick Banks.

12  Q        And on each of these reports does Mr. Banks list his

13  address?

14  A        Yes.   The street address he provided in each of these,

15  of these submission reports, lists Frederick Banks's residence

16  as 52 South 8th Street, Pittsburgh PA, 15203.

17  Q        And do they also include a telephone number?

18  A        They do.   In each report it lists a -- in two instances

19  a cell phone of (412)515-9670 and the -- another instance

20  lists it as a home phone, but the same phone number,

21  (412)515-9670.

22  Q        And if you could look at Government Exhibit 10, do you

23  see that before you?

24  A        I do.

25  Q        And there's a section down there, Part D, monthly

1    financial statement.

2    A       Okay.

3    Q       What were Mr. -- what did Mr. Banks report as his net

4    earnings from employment?

5    A       In the Part D section he lists net earnings from

6    employment -- it looks like $84.00.

7    Q       Does he reflect any bank accounts there?

8    A       He does.  He indicates that he has a First Niagara

9    account with a balance of 2 -- the cents is not legible; and

10   then a Wells Fargo account with a balance of $6.00.

11   Q       And does Mr. Banks indicate whether or not he has a

12   post office box?

13   A       He does.  In that same section it asks:  Do you rent or

14   have access to a post office box?  And he indicates that he

15   does, and he provides the address of PO Box 42303, Pittsburgh,

16   Pennsylvania, 15203.

17   Q       And if you could look at Government Exhibit 11, sir.

18   A       Uh-huh, yes.

19   Q       Does Mr. Banks list employment?

20   A       He does under the Part B employment section.  He

21   indicates that his employer is Hexagon Records with an address

22   of PO Box 42303 in Pittsburgh, Pennsylvania.

23   Q       And in the monthly financial statement does he indicate

24   his net earnings from employment?

25   A       There's a section in Part B that lists that.  He has

1    gross wages from Hexagon Records as $224, position held as

2    president.  And then down below in the monthly financial

3    section Part D he lists earnings from employment as $180.

4    Q      And does he indicate he has any bank accounts?

5    A      Again he indicates that he has a First Niagara bank

6    account, appears to be with $25, and then a Wells Fargo

7    account with what looks like $590.

8    Q      And does he indicate if he has a post office box?

9    A      Again, he answers the question that he does have -- he

10   does rent or have access to a post office box and provides

11   PO Box 42303 in Pittsburgh, Pennsylvania.

12   Q      If you can look at Government Exhibit 12?

13   A      Yes, sir.

14   Q      And focus you to the monthly financial statement.  Does

15   he indicate total monthly cash inflows and outflows?

16   A      He does.  His monthly cash inflows is listed as $600

17   approximate; and again the line below, total monthly cash

18   outflows of $600 approximate.

19   Q      Does he reflect if he has any bank accounts?

20   A      He does.  Two bank accounts.  One is First Niagra, and

21   in this instance he indicates that there is an account number,

22   and he lists it there, and the account ends in 8507 and has a

23   $70 balance.  And then a Wells Fargo account that looks like

24   it has a last few digits of --

25   Q      Could that be a negative ten-ten?

1   A      Yes, it has a negative balance of ten-ten.

2   Q      And while -- the First Niagara account, could that be a

3   negative ten dollars?

4   A      It appears to be a negative ten dollars, overdrafts.

5   Q      Did you obtain the rental application for PO Box 42303,

6   Pittsburgh, PA, 15203, as reflected in Government Exhibit 10,

7   11 and 12?

8   A      Yes, sir.

9   Q      What -- who owns that box?

10         DEFENDANT BANKS:  Objection.

11         THE COURT:  Who is the named --

12  BY MR. CESSAR:

13  Q      Whose name is on that box?

14  A      The PO box was rented on or about May 30th of 2013

15  for the business use in the name of Hexagon Records.  The name

16  of the person applying for the PO box was Frederick Banks,

17  residing at 52 South 8th Street in Pittsburgh, PA, 15203.

18  Q      And the procedure when somebody opens a box, do you

19  have to provide identification before they'll open the box?

20  A      Yes, sir.

21  Q      Did you talk to somebody at the post office to see if

22  that was done?

23  A      I did, and it was also indicated on the opening -- the

24  opening form to rent the box.

25  Q      So --

1    A      The form indicated that the identification provided by

2    Frederick Banks was a Pennsylvania driver's license; and on

3    the form somebody indicated the operator license number of

4    6844 which correlates and matches to his actual Pennsylvania

5    Department of Transportation's records.  It's the same

6    operator license number.

7    Q      And one last point on Government Exhibits 10, 11 and

8    12.  Does it represent gross wages on there anywhere?

9    A      It does, on -- in the Part B employment section for

10   Government Exhibit 10, although he doesn't list who the

11   employer was, he indicates that he is the president and has

12   gross wages of $234.  In Exhibit 11, Employment B -- Part B

13   section he lists employer as Hexagon Records, and he has gross

14   wages of $224.  And then on Exhibit 12 he lists the employer

15   as McDonald's and he has gross wages of $600 for the month.

16   Q      Could you look at Government Exhibit 3, sir.

17   A      Yes.

18   Q      What is that document?

19   A      This is another secure online account application form

20   submitted through the Internet using the Web site forex.com

21   for an account opening in the name of Mr. Freddie Banks.

22   Q      And what information is contained on that account

23   application?

24   A      This -- I'll add that this form was also received from

25   Gain Capital for the Grand Jury subpoena.  What was the

1    question you asked?

2    Q       What information is contained on there?

3    A       The account was named in the name of Mr. Freddie,

4    F-R-E-D-D-I-E, Banks.  The name and e-mail address was

5    provided of FredBanks123@ymail.com.  Home phone number is

6    listed as (412)481-6564.  It's an individual account as

7    opposed to a corporate or business entity account.  The home

8    address listed for Mr. Freddie Banks is 52 South 8th Street,

9    Pittsburgh, Pennsylvania, 15203.  Also indicates that

10   Freddie Banks was a US citizen with a Social Security number

11   ending in 0573 with a date of birth of September 10, 1967.

12           Mr. Freddie Banks lists himself as a business

13   professional with an employer of Holcomb, H-O-L-C-O-M-B, and

14   that he is a vice-president of sales with a business address

15   of 1739 East Carson Street in Pittsburgh, Pennsylvania, 15203.

16   Q       Annual income?

17   A       The annual income listed for Mr. Freddie Banks shows

18   that it's over $500,000 and the net worth of over $5 million.

19   Q       And trading experience?

20   A       Trading experience for Mr. Freddie Banks is over three

21   years for stocks and equities and over three years for options

22   and over three years for futures and Forex training.

23   Q       I'd like to go back a second.  I neglected to ask you a

24   question.  You indicated that the post office box was opened

25   with the e-mail FredBanks123@ymail.com?

1    A      Yes, sir.

2    Q      If you look at Government Exhibit 1, which is the

3    Fred Banks Forex account opening document --

4    A      Yes, sir.

5    Q      -- is that the same e-mail address as on that document?

6    A      Yes, it is.

7    Q      Okay, thank you.

8          DEFENDANT BANKS:  Objection.  I don't understand.  I

9    want him to clarify that.  I don't understand what he's

10   saying.

11   BY MR. CESSAR:

12   Q      Sir, is the e-mail address used in the opening

13   documents for the Frederick Banks Forex account the same

14   e-mail address that was used and provided in opening the post

15   office box?

16   A      Yes, sir; both the forex.com account and the post

17   office box information was provided with the same e-mail

18   address, FredBanks123@ymail.com; same e-mail address.

19         THE COURT:  The objection is overruled.

20   BY MR. CESSAR:

21   Q      Sir, if you would look at Government Exhibit 4 and

22   explain to us what this document is.

23   A      Sure.  Government Exhibit 4 was a schedule also

24   provided by -- to me by Gain Capital.  It is a schedule of

25   approximately 70 electronic ACH transactions between the dates

1   of --

2           DEFENDANT BANKS:  Objection.

3           THE COURT:  What's the basis?

4           DEFENDANT BANKS:  It doesn't say it's a schedule on

5   this document anywhere.

6           THE COURT:  He can testify to --

7   BY MR. CESSAR:

8   Q       What is this document, sir?

9           DEFENDANT BANKS:  He indicates a schedule; it

10  doesn't say it.

11  BY MR. CESSAR:

12  Q       Is this a list of ACH transfers from First Niagara Bank

13  to Forex?

14  A       Yes, sir.

15          DEFENDANT BANKS:  Objection.  It doesn't say

16  anywhere on here that it's Forex -- it says Forex.  It doesn't

17  say forex.com.  It says nowhere on here that it's First

18  Niagara on this document.

19          THE COURT:  Why don't you lay a foundation, please.

20  BY MR. CESSAR:

21  Q       Sir, what does this document represent and where did

22  you obtain the information?

23  A       Again, this information came via subpoena production

24  from Gain Capital in relation to the forex.com accounts opened

25  in the name of Mr. Frederick Banks, Mr. Freddie Banks, and

1   also an account opened in Adam Corcoran's name.  This is a

2   document that was provided to me indicating a listing of ACH

3   deposit transactions between an account held at First Niagara

4   Bank that was -- which describes and identifies approximately

5   70 transactions of moving money from the First Niagara account

6   into the newly opened Forex account in the name of

7   Mr. Freddie Banks.

8   Q      And what is the total amount of these over 70 --

9          THE COURT:  The objection is overruled with that

10  foundation being laid.

11  BY MR. CESSAR:

12  Q      -- over 70 automated clearinghouse deposits, what was

13  the total amount?

14  A      It was approximately $315,000.

15  Q      And is that from the account ending in 0906 at

16  First Niagara?

17  A      Yes, sir.

18  Q      Is that the same account that was used --

19         DEFENDANT BANKS:  Objection.  There's nothing on

20  here to indicate that it came from any First Niagra account.

21         THE COURT:  You can cross examine him.

22         DEFENDANT BANKS:  Okay.

23         THE COURT:  It's overruled; you may proceed.

24  BY MR. CESSAR:

25  Q      Okay.  You can answer the question.  Was that from the

1    account number ending in 0906 at First Niagara?

2    A      Yes, sir.

3    Q      And you know that from the records of Gain Capital.

4    A      Yes, sir.

5    Q      Between August 22nd and 23rd was there an attempt

6    to draw money out of that account?

7    A      Yes, sir; there was.

8    Q      And if you could look at Government Exhibit 8, what is

9    that document?

10         DEFENDANT BANKS:  Objection.  There's nothing that

11   ties 8 to this document on the withdrawal, nothing.

12         THE COURT:  Just lay a foundation, please.

13   BY MR. CESSAR:

14   Q      Government Exhibit 8, from where did you obtain this

15   document?

16   A      Yes, sir.  This document was obtained via Grand Jury

17   and subpoena production from Gain Capital.  This document

18   details a listing of attempted withdrawals from the newly

19   opened forex.com account in the name of Mr. Freddie Banks

20   between the dates of August 22nd and August 23rd of this

21   year.

22   Q      And were the majority attempted outgoing wire

23   transfers, but were two of those attempts via check?

24   A      Yes, there were.

25   Q      What was the total amount --

1          DEFENDANT BANKS:  There's nothing here that says

2   outgoing was -- it doesn't say anything about outgoing.

3          THE COURT:  You can ask on cross examination.

4          DEFENDANT BANKS:  Okay.

5          THE COURT:  You can proceed; overruled.

6   BY MR. CESSAR:

7   Q      There is a line notice that says initial funding wire.

8   What does that mean?

9   A      It was described to me in my conversations with the

10  Gain Capital representatives that this schedule details

11  outgoing wire transactions from the forex.com account in the

12  name of Mr. Freddie Banks to several accounts, also listed on

13  this schedule, to being accounts held at First Niagara Bank,

14  one an account at American Express, and then there are two

15  checks detailed at the bottom in the amount of $4,800 each.

16          The outgoing wires were sent -- were attempted to be

17  sent to a First Niagara account ending in 8507 and 0906, both

18  of which based on records received from First Niagara that

19  they were accounts opened and maintained by

20  Mr. Frederick Banks.

21  Q      And is that set forth in Government Exhibit 17, which

22  you previously testified to?

23  A      I think it was --

24  Q      Or was it 19?

25  A      -- Government Exhibit 19.

1  Q      Government Exhibit 19.

2  A      Yes, sir.  Nineteen.

3  Q      Okay.  Did Gain Capital record a conversation by

4  somebody purporting to be Freddie Banks and one of its

5  employees?

6  A      Yes, sir.

7  Q      And is that Government Exhibit 9?

8  A      I believe it is.

9         MR. CESSAR:  May I have your indulgence a second --

10        DEFENDANT BANKS:  I'm going to object on the grounds

11 of admissibility of the recording.

12        THE COURT:  Could you just lay a foundation, please.

13        MR. CESSAR:  Sure.  I have to -- one second --

14 BY MR. CESSAR:

15 Q      Sir, did you subpoena Gain Capital?

16 A      Yes, I did.

17 Q      Did they provide a copy of a recording which they made

18 between somebody purporting to be Freddie Banks and one of

19 their employees?

20 A      Yes, sir.

21        MR. CESSAR:  I have to do this again --

22        (Recording played in open court.)

23        DEFENDANT BANKS:  I want to object, Your Honor.

24        (Recording continues.)

25        DEFENDANT BANKS:  Objection.

1          THE COURT:  What's the objection?

2          DEFENDANT BANKS:  The objection is I don't have

3    Michael or whoever this guy is in this courtroom to cross

4    examine him.  It's under the confrontation clause.  How can

5    they do this?  This is unbelievable.

6          THE COURT:  This is not a criminal trial.  This is a

7    hearing on a revocation of supervised release and the Court is

8    allowed to hear -- have hearsay testimony.

9          You may proceed.

10         DEFENDANT BANKS:  Your Honor, in --

11         THE COURT:  I've already overruled this.

12         You may go on.

13   BY MR. CESSAR:

14   Q     Have you had an opportunity to hear Mr. Banks's voice?

15   A     Yes, I have.

16   Q     Whose voice was that on the tape?

17         DEFENDANT BANKS:  Objection, he's not an expert in

18   voice analysis.

19         MR. CESSAR:  He can testify as a lay witness,

20   Your Honor.

21         THE COURT:  Yes.

22   BY MR. CESSAR:

23   Q     Whose voice is that?

24   A     It to me sounds like Mr. Frederick Banks.

25   Q     Thank you.  And there was a statement in there, the

1    person Fred Banks indicated that he was going to provide an

2    online statement and copied and pasted right to you.

3         Could you look at Government Exhibit 6, sir.

4    A    Yes.

5    Q    What is that?

6    A    This is a document that I received from Gain Capital

7    again via Grand Jury subpoena production.  They --

8    Gain Capital told me that the account that was opened in

9    Freddie Banks had all these multiple transactions of incoming

10   and outgoing wires that were -- in such a short period of

11   time, so forex.com and Gain Capital put a freeze on the

12   account to evaluate and determine if -- you know, the validity

13   of these transactions.

14        As part of this process they requested that

15   Mr. Freddie Banks, purportedly the individual that opened this

16   Forex account, provide a bank statement to show that there

17   were enough funds in the account, the account that was

18   indicated where these monies were coming from, again ending in

19   0906.  They requested a document to substantiate there were

20   funds in the bank account for which these deposits were coming

21   over.

22        This document was what purportedly Mr. Freddie Banks

23   provided to Gain Capital to substantiate the second account.

24   It's a bank statement looking to be a First Niagra screen shot

25   indicating that it was a checking account number ending in

1   0906 with a current balance of $2,100,621.08 and an available

2   balance of $2,062,321.51 as of August 23rd, 2013.

3   Q       And this is what was discussed in Government Exhibit 9,

4   which was the telephone conversation.

5   A       That's what the Gain Capital representatives were

6   telling me, yes.

7   Q       And have you subpoenaed First Niagara Bank for the

8   records relating to the account ending in 0906?

9   A       Yes, I have.

10   Q       Would you look at Government Exhibit 17.

11   A       I have.

12   Q       What is that document?

13   A       This is Grand Jury subpoena production from First

14   Niagara Bank and is a statement, is a bank statement for the

15   time period between July 28th of 2013 with an ending date of

16   approximately September 9th of 2013 in the account styled in

17   the name of Frederick H. Banks.

18   Q       And as of 8-23-2013 what is the balance in that

19   account?

20   A       It doesn't specifically list August 23rd.  However,

21   the most recent balance on August 22nd of 2013, the day

22   before, shows a negative balance of 4,621.08.

23   Q       So it's not a balance as reflected in Government

24   Exhibit 6 of $2.1 million.

25   A       Definitely not.

1    Q       Now, the account that was used that was opened in the

2    name of Freddie Banks, did it have a Social Security number

3    associated with it?

4    A       Yes, sir; it did.

5    Q       What were the last four digits of that account number?

6    A       The Social Security number provided as purportedly

7    being issued to Mr. Freddie Banks through the forex.com online

8    application shows a last four digits of 0503.

9    Q       And who does that number go back to?

10   A       It is a valid issued Social Security number and it does

11   come back to a Freddie Banks.  However, the database searches

12   indicate that that individual is deceased.

13   Q       And that was Mr. Banks's mother, correct?

14   A       I believe it was, yes.

15   Q       She died approximately December 18th of 2006?

16   A       Yes, sir.

17           DEFENDANT BANKS:  Objection.  What relevance is

18   that, when my mother died?

19           MR. CESSAR:  Your Honor, an account is opened in a

20   deceased person's name.  The entity opening it doesn't know

21   that.  That's part of the fraud.  I have -- the Government has

22   to show that the person is in fact deceased.

23           DEFENDANT BANKS:  When she died, what relevance is

24   that, when?

25           THE COURT:  It just is -- it is explanatory

1  information with respect to the person being deceased, and

2  it's relevant to note that she was deceased prior to the dates

3  in question.  So the Court is going to permit it.  It's

4  overruled.

5  BY MR. CESSAR:

6  Q      Okay.  If you could look at Government Exhibit 15, sir.

7  A      I have it.

8  Q      What is that document?

9  A      This is another secure online account application that

10 was opened through the Internet through the forex.com Web site

11 in the name of Mr. Frederick Banks.  I received this again via

12 Grand Jury subpoena production from Gain Capital.

13 Q      And what information is contained therein?

14 A      The account was opened in Mr. Frederick Banks's name

15 with an e-mail address of Frederick -- I'll spell it --

16 F-R-E-D-R-I-K-B-A-N-K-S and the number is 777@gmail.com.  It

17 has -- lists a home phone number of (412)567-8097, a mobile

18 phone of (412)515-9670; and this is a -- an individual account

19 as opposed to a corporate or business entity account.

20        The home address listed for Mr. Frederick Banks has

21 52 South 8th Street, Pittsburgh, PA, 15203.  Mr. Frederick

22 Banks hold himself out to be a US citizen.  The last four

23 digits of his Social Security number, 6411, with the date of

24 birth of 9/10 of 1967.  The application information provided

25 on the application provided by Mr. Frederick Banks shows he's

1   employed by Hexagon Records, that he's an executive, and his

2   occupation of sales, retail and customer service; and the

3   business address is listed as PO Box 42303, Pittsburgh, PA,

4   15203.

5   Q      And does it indicate an annual income and net worth?

6   A      It does.  Mr. Frederick Banks reported he has an annual

7   income of over $500,000, with a net worth of over $5 million,

8   and again trading experience over three years of stock and

9   equities, experience indicated.

10  Q      And the mobile phone number listed in that application,

11  is that the same number as Government Exhibit 16, the records

12  you obtained from Sprint?

13  A      Exhibit 16 is the subscriber information obtained by

14  Grand Jury subpoena from Sprint, and it is the same cell phone

15  number, (412)515-9670.

16  Q      And the employer name there is Hexagon Records.  Could

17  you look at Government Exhibit 11, which is the

18  September 17th, 2013, monthly supervision report for

19  Mr. Banks.  And does that indicate employment?

20  A      It does.  In Part B, employment, it lists Hexagon

21  Records with a PO Box of 42303 in Pittsburgh, PA.

22  Q      And that's the same as in the application we're just

23  talking about?

24  A      Yes, sir.

25  Q      Now, sir, could you look at Government Exhibit 7.

1   A       I have it.

2   Q       What is that, sir?

3   A       This is yet another secure online account application

4   that I received by Grand Jury subpoena from Gain Capital.  It

5   indicates -- this account was -- the information supplied was

6   through the Internet, through the forex.com Web site, opened

7   in the name of Mr. Adam Corcoran, C-O-R-C-O-R-A-N.

8   Q       And what is the e-mail address?

9   A       The e-mail address is listed H-L-L-C-F-A-C-T-O-R at

10  yahoo.com.

11  Q       Home phone number?

12  A       Would you like me to just go down --

13  Q       Yeah, just go down.

14  A       The home phone number listed for Mr. Corcoran is

15  (412)709-5443.  This is a -- as opposed to the three previous

16  accounts, this is a corporate business entity account.  The

17  company -- the name of the company listed is HLLC.  The

18  beneficial owner of HLLC is -- purportedly is Adam Corcoran as

19  a US resident and US citizen with a Social Security number of

20  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.  The date of birth of December 9 of 1971.  The

21  company address is 1739 East Carson Street, Pittsburgh PA,

22  15203.

23          It also has a Tax ID No. for HLLC as 52-236-7293.  And

24  the officer for HLLC is listed as Adam Corcoran as the CEO.

25  The annual income shows over $36 million for HLLC and the net

1    worth of over $98 million.

2    Q      The company address listed there, 1739 East

3    Carson Street, Pittsburgh, PA, 15203?

4    A      That's right.

5    Q      If you could look at Government Exhibit 3, which is the

6    account in the name of Freddie Banks, is that the same

7    business address?

8    A      All right -- the Exhibit 3 -- the business address

9    looks here -- the business is Holcomb Company, does list the

10   business address of 1739 East Carson Street, Pittsburgh, PA,

11   which matches the address provided in this online application

12   for Adam Corcoran.  The company HLLC lists a company address

13   of 1739 East Carson Street.

14   Q      And what is Mr. Corcoran's purported income and net

15   worth?

16   A      On Page 2 of the application it shows that the

17   financial income for the company HLLC, not Adam Corcoran

18   personally, is $36 million and the net worth of $98 million.

19   Again this is a business account, not an individual account.

20   Q      And if you go to the --

21          DEFENDANT BANKS:  I'm going to object. I'll object.

22          THE COURT:  I'm sorry?

23          DEFENDANT BANKS:  What does this application have to

24   do with Frederick Banks?

25          MR. CESSAR:  We're going to get to that, Your Honor.

1          THE COURT:  He's going to get to that.  I'll permit

2     it.

3     BY MR. CESSAR:

4     Q      If you could look at the fourth page of that document,

5     it's captioned corporate entity account questionnaire.

6     A      Yes, sir.

7     Q      And does it indicate -- it's hard to read, but it says:

8     Please provide a detailed account of your core business

9     activities, your revenue sources.  Can you read that?

10    A      I do see it, but --

11    Q      Okay.

12    A      The copy is not --

13    Q      Can you see --

14    A      The corporate entity name is HLLC.

15    Q      And Adam Corcoran is a hundred percent owner?

16    A      It does indicate that, yes.

17    Q      Okay.  And is there a signature on the bottom?

18    A      There is.  There's a signature line with a signature

19    and the name is Adam Corcoran; and in print underneath with

20    the title of either CEO or CFO.  It's hard to read.

21    Q      And if you go to the next page of that document, what

22    is that?

23    A      This -- this again was provided to me as Grand Jury

24    subpoena production.  In speaking with Gain Capital they

25    indicated that when there is a corporate entity involved, they

1    request and require banking information to substantiate the

2    opening of the account.  This is purportedly a bank statement

3    with the bank Eureka Bank in the name -- the account is in the

4    name of Hexagon, LLC, with an address of 1739 East

5    Carson Street with a Suite No. of 353 in Pittsburgh, PA,

6    15203.  The account's listed as 01-25-12352, and it shows as

7    of August -- August 30th, 2013, it has an ending balance of

8    $664,997.83.

9    Q    And Hexagon, LLC, that is an entity that Mr. Banks had

10   used previously?

11   A    That is my understanding, yes.

12   Q    And --

13            DEFENDANT BANKS:  Objection.

14            THE COURT:  Do you want to lay a foundation for how

15   he has that understanding?

16   BY MR. CESSAR:

17   Q    If you could look at Government Exhibit 11, sir, which

18   is September 17, 2013 --

19   A    Yes.

20   Q    -- does it indicate the name Hexagon Records?

21   A    It does, as the employer information, Hexagon Records.

22   Q    Sir, did you subpoena Eureka Bank?

23   A    Yes, I did.

24   Q    Could you look at Government Exhibit 18.

25   A    I have it.

1        DEFENDANT BANKS:  Objection, because that's still

2   not a foundation because there is no indication that I

3   opened -- that I used -- this is me.

4        MR. CESSAR:  We're going to get to that.

5        THE COURT:  We're going to come to that.

6        DEFENDANT BANKS:  Okay.

7   BY MR. CESSAR:

8   Q     Sir --

9   A     I have Exhibit 18, yes.

10  Q     Okay.  What is that?

11  A     This is a Grand Jury subpoena production from

12  Eureka Bank.  We had requested account information to -- you

13  know, on the account number 01-25-12352.  This is their

14  production and subpoena response to that Grand Jury.

15  Q     What do they indicate?

16  A     They indicate that Eureka Bank has no accounts related

17  to Mr. Banks.  His account in question was closed out in 2004.

18  I followed up with a phone call to Eureka Bank to again

19  clarify their statement here, and they told me that the

20  account number that's listed on this purported bank statement

21  did exist.  It was opened in the name Hexagon, LLC, with that

22  address, with Frederick Banks as the authorized signer on the

23  account.  However -- and that is the only account that they

24  have.  However, that account was closed down in 2004, so there

25  has not been an active account in many years.

1  Q      So at the time of this bank statement, 30 August, 2013,

2  the account had been closed for nine years?

3  A      Correct.

4  Q      But prior thereto had been an account at Eureka Bank in

5  the name of Hexagon, LLC, opened by Mr. Banks.

6  A      Correct.

7  Q      Did you talk to Adam Corcoran?

8  A      I did.

9  Q      You interviewed him yesterday?

10  A      I interviewed him I believe on Monday, yes.

11  Q      Okay.  How did you find him?

12  A      The -- it's interesting.  When I ran the Social

13  Security number as listed, as belonging to and issued to

14  Mr. Adam Corcoran, it came back as not an active or valid or

15  ever issued Social Security number.

16          When we executed a search warrant on the residence of

17  Mr. Frederick Banks at 52 South 8th Street in Pittsburgh, PA,

18  during the search I found a document --

19          DEFENDANT BANKS:  I'm going to -- I never received a

20  copy of the search warrant or anything.

21  BY MR. CESSAR:

22  Q      Special Agent --

23  A      Yes, sir.

24  Q      -- was there a search executed?

25  A      Yes, there was.

1   Q      Was an inventory left at the address?

2   A      Yes, sir; along with a copy of the warrant.

3          DEFENDANT BANKS:  I object.  I want to have that at

4   the hearing if he's going to testify to it.

5          THE COURT:  Overruled at this stage.  If you do have

6   a copy of the search warrant --

7          MR. CESSAR:  I can give him a copy of -- not the

8   search warrant, but of the inventory.

9          DEFENDANT BANKS:  What about the house, is it

10  secured?

11         THE COURT:  We're going to move on.

12  BY MR. CESSAR:

13  Q      And can you look at Government Exhibit 20.

14  A      Yes, sir.

15  Q      What is that?

16  A      This is a photocopy of a driver's license for

17  Adam E. Corcoran, the third.  I found this document in the

18  residence of Mr. Frederick Banks at 52 South 8th Street in

19  Pittsburgh, PA, amongst some of his belongings in one of the

20  rooms inside the house.

21  Q      And using this identification, were you able to track

22  down Mr. Corcoran?

23  A      Yes, sir.

24  Q      And you interviewed him you said?

25  A      I did.

1   Q       What did he tell you about his relationship with

2   Mr. Banks?

3   A       He indicated that he -- he at one point was friends

4   with Mr. Frederick Banks.  They were in a band together.  They

5   toured together back in the late '90s, early 2000s.  There was

6   a -- they had a falling out over some monies that Mr. Corcoran

7   thought that he was owed by Mr. Frederick Banks, and they

8   broke off relationship in the early 2000s.  He hasn't seen or

9   really had any subsequent conversations with him since the

10  early 2000s.

11  Q       And did you show him a copy of Government Exhibit 20?

12  A       Yes, sir; I did.

13  Q       What did he tell you about that?

14  A       He told me that he had no knowledge of Gain Capital or

15  forex.com, that he had never opened an account via the

16  Internet with forex.com, that all this information provided to

17  open the account was not provided by him and it was fraudulent

18  and he had no idea that this had happened.  He doesn't know

19  the address 1739 East Carson Street, he has -- never had been

20  affiliated or had any interest in any companies connected to

21  or affiliated or owned by Frederick Banks.

22  Q       Such as HLLC?

23  A       Correct.

24  Q       Or Hexagon.

25  A       Correct.

1   Q       If you look at Government Exhibit 7, did you ask him

2   about was that his signature?

3   A       I asked him several things.  I asked him if the Social

4   Security number was accurate and he said no.  The date of

5   birth was his date of birth.  I showed him the signature on

6   the corporate entity account questionnaire where it was

7   indicated that Adam Corcoran was a hundred percent owner of

8   HLLC, and I showed him the signature down below.  He said it

9   looked a lot like his signature, but he -- you know, he had

10  never seen this document, he had never signed nor given

11  permission for anybody to sign his name on any documents.

12  There was a forgery according to Adam Corcoran.

13              DEFENDANT BANKS:  Objection.

14              THE COURT:  Overruled.

15  BY MR. CESSAR:

16  Q       Did you ask Mr. Corcoran how Mr. Banks obtained his

17  driver's license?

18  A       He -- I did.  He indicated that, you know, they were

19  friendly back in the late '90s, early 2000s; that they had

20  toured together, they shared the same room, ate together, went

21  to bars together.  He told me that he never provided his

22  driver's license to Mr. Banks.  He does not know how

23  Frederick Banks obtained a copy of his driver's license, but

24  he was quite alarmed when I showed him the copy of it.

25  Q       And when the search warrant was executed, did you find

1  computers and Internet or equipment that can access the

2  Internet?

3  A       I did, yes, sir.

4  Q       What did you find?

5  A       I don't have the inventory in front of me but going

6  from memory we seized multiple laptops, an Apple product like

7  an iPad mini, looked like a Kindle Fire, we seized a cell

8  phone, all of which -- all could have access to the Internet,

9  including laptops -- multiple laptops and netbooks.

10  Q       After Mr. Banks was arrested on the supervised release

11  petition, did the United States Marshal's service seize

12  certain items from him?

13  A       Yes, they did.

14  Q       And could you look at Government Exhibit 14.

15  A       I have it.

16  Q       What are those exhibits?

17  A       This is a photocopy of just a few of the debit cards,

18  credit cards, prepaid cards that were on Mr. Frederick Banks

19  person incident to this arrest.

20  Q       And the one on Mastercard is a credit card?

21  A       It does appear to be a credit card, yes, as opposed to

22  the other four -- other three cards there which all are debit

23  cards.

24              MR. CESSAR:  If I may have a moment, Your Honor?

25              (Brief pause in proceedings.)

1          MR. CESSAR:  I have no further questions,

2    Your Honor.

3          THE COURT:  Thank you.  Are you moving to admit

4    these exhibits?

5          MR. CESSAR:  Yes.  I was going to -- I move to admit

6    the Government Exhibits that have been tendered to the Court.

7          THE COURT:  We just need to go through those.

8          MR. CESSAR:  I will.

9          THE COURT:  Thank you.

10          MR. CESSAR:  Government Exhibit 15, 3, 20, 14, 7,

11    18, 11, 12, 10, 16, 6, 17, 8, 1, 2 and 4, and Exhibit 9 which

12    is the tape.

13          THE COURT:  Is there an Exhibit 19 here?  It was in

14    my pile.

15          MR. CESSAR:  I might have missed it.  That was --

16    can you help me out, Special Agent?  I'm terrible with

17    records.

18          THE WITNESS:  Sure.  19 is the First Niagara

19    production.

20          THE COURT:  I'm sorry --

21          MR. CESSAR:  That's 14.

22          THE COURT:  That is 14.

23          MR. CESSAR:  And 19 is the customer profile from

24    First Niagra.

25          THE COURT:  I'll just clarify this on here.

1          MR. CESSAR:  That's why I had Cs in writing in
2    elementary school.
3          THE COURT:  Mr. Banks, do you have an objection?
4          DEFENDANT BANKS:  To what?
5          THE COURT:  The admission of the exhibits.
6          DEFENDANT BANKS:  No, go right ahead.  No objection.
7          THE COURT:  They are admitted.
8          Would you like to cross examine the witness?
9          DEFENDANT BANKS:  If I could, I would like to get a
10   copy of the search warrant that he talked about and the
11   affidavit attached.  You stated you have it?
12         THE COURT:  He's going to give you a copy of the
13   inventory.
14         DEFENDANT BANKS:  The inventory, yes, correct.
15         THE WITNESS:  I might have a copy.
16         MR. CESSAR:  May the agent step down --
17         THE COURT:  Yes.
18         MR. CESSAR:  -- and take a look?
19         (Agent steps down from stand and looks for inventory
20   and search warrant.)
21         MR. BANKS:  And the warrant itself --
22         (Off the record discussion.)
23         MR. CESSAR:  We have one copy, Your Honor.  Would
24   it -- could I impose upon somebody to make a copy while we're
25   waiting?  Would that be okay?

S. Langford - Cross

1          THE COURT:  Hand it up.

2          MR. CESSAR:  Thank you.

3          (Copy prepared.)

4          THE COURT:  Would you like to start your cross

5    examination?

6          DEFENDANT BANKS:  Sure.

7                    CROSS EXAMINATION

8    BY DEFENDANT BANKS:

9    Q       Government Exhibit 4 --

10         THE COURT:  What's the exhibit number?

11         DEFENDANT BANKS:  4.

12         THE COURT:  Could you come to the podium?  It might

13   be easier for the court reporter.

14         DEFENDANT BANKS:  Who, me?

15         THE COURT:  Yes.

16         DEFENDANT BANKS:  All my stuff is right here,

17   though.

18         THE COURT:  Then move the microphone closer to you

19   then and speak directly into the bulb of the mike.

20         DEFENDANT BANKS:  Is that better?

21         THE COURT:  Much better.

22   BY DEFENDANT BANKS:

23   Q       Government Exhibit 4.

24   A       I have it.

25   Q       Got it?

S. Langford - Cross

1   A      Yes, sir.

2   Q      Tell me, agent -- what was your name again?

3   A      Sean Langford.

4   Q      Mr. Langford -- Agent Langford, what on here -- on this

5   exhibit shows anything that's tied to any First Niagra on this

6   account from looking at this exhibit?

7   A      Sure.  That's a good question.  The schedule shows

8   on -- you know, it has rows and columns, and at the top it has

9   an index of what --

10         DEFENDANT BANKS:  Objection, non -- non-responsive

11  to my question.

12         THE COURT:  He's explaining to you the answer.  Let

13  him finish his answer.

14         DEFENDANT BANKS:  Okay.

15         THE WITNESS:  The column that is headlined amount,

16  account, suffix.  Below the dollar amount, I'll direct you to

17  the first line, the very top line that has account information

18  in it.  It shows that there's a dollar amount of $4,500 USD,

19  US dollars, and underneath it is an indication of 0906; and

20  you'll see that designation all the way down for all of these

21  approximately 70 items.

22         Speaking with Gain Capital and reviewing this

23  document, this is where it indicates that all these ACH

24  deposits were coming from an account ending in 0906.

25

S. Langford - Cross

1    BY DEFENDANT BANKS:

2    Q      Okay.  And what on here -- just looking at the

3    document -- ties it to forex.com?

4    A      This was provided to me by the company, Gain Capital,

5    which owns and operates forex.com.  So I -- and this was

6    produced by Grand Jury subpoena production from said company,

7    so this is in the context of forex.com.  But on the top of

8    each row here the headline for merchant ID, date and time, if

9    you see, that indicates forex, F-O-R-E-X.  But this again was

10   provided to me in the context of a Grand Jury subpoena

11   production from Gain Capital and Forex.

12   Q      I'm sure you know it's just a foreign exchange, just

13   currency.  There is -- what is on here to indicate that that's

14   forex.com on this, looking at this document?

15   A      I think you have to take it in the context of what the

16   document is and how it's produced.  It does not say forex.com

17   on the document.  However, it was provided to me by forex.com

18   in relation to the account that was opened and provided from

19   Grand Jury subpoena production.

20   Q      You said you executed a search warrant at 52 South 8th

21   Street, correct?  You were present at the search?

22   A      Yes, I was.

23   Q      Okay.  How did you get into the residence, using a key?

24   A      We attempted to use a key.  However, there was a lock

25   on the front door that was not responsive to a key.  The first

S. Langford - Cross

1  window next to the front door was unlocked, so we opened the

2  window and made access that way.

3  Q      Did you secure the house?

4  A      Yes, I did.

5  Q      Now, the account number you were talking about on

6  Exhibit 4, again 0906, the ending account number ties to what

7  First Niagara account?

8  A      The account in your name, Frederick H. Banks, full

9  account number XXXXXX0906.

10  Q      Okay.  Let's look at Government Exhibit 6.  Have it?

11  A      Yes.

12  Q      Whose name is on it?

13  A      It does not list an individual's or company name on

14  this document.

15  Q      You stated -- you've done -- I guess you've done --

16  you've done more investigations than fraud cases, is that

17  correct?

18  A      Yes.

19  Q      Are you familiar with a brokerage account?

20  A      Brokerage account?

21  Q      Yes, or trading account.

22  A      What kind of trading account are you referring to?

23  Q      Any kind.

24  A      I have had investigations where I have seen and

25  experienced trading accounts in various types of assets.

S. Langford - Cross

1    Q      Okay.  And trading accounts, would you agree, require
2    cash to open it?
3    A      No, I disagree.  No, not necessarily.
4    Q      My question is a forex.com account requires cash,
5    correct, to open it.
6    A      I disagree with your characterization of how you open
7    an account.  You need some kind of funds, whether it's an
8    actual deposit or it's a movement of -- electronically moving
9    of funds.  It depends on where you open the account and how
10   you do it and where you do it.
11   Q      Let me change the question.  To fund a forex.com or
12   Gain Capital account does it require cash?
13   A      In order to open an account and effect trades, there
14   needs to be a balance of available funds in order to purchase
15   securities in whatever form it is, whether it's futures or
16   foreign exchange options.  So, yes, I would agree with you
17   there needs to be funds established in an account in order to
18   trade on that account.
19   Q      And because it requires cash to have an account at
20   Forex or Gain, it is not a credit account.  Correct?
21   A      All I know is that there needs to be funds in the
22   account.  It is not a -- depends on where the funds come from,
23   whether it's a loan or it's actual assets and liquid assets in
24   a checking account or whatever.  There needs to be funds in a
25   forex.com trading account.  I don't believe they care where it

S. Langford - Cross

1    comes from except it needs to be legitimate funds in order --

2    Q      What is a credit account?

3    A      A credit account is typically an individual or company

4    gains access to funds via a credit risk application.  It's

5    like a loan.

6    Q      And okay -- Government Exhibit 15.

7    A      Yes.

8    Q      Give me one second, I apologize.  I'm sorry, Government

9    Exhibit 1 is what I meant to ask you.  Do you have it?

10   A      Yes, sir.

11   Q      Okay.  I want to go down to the security question.  Let

12   me ask you this:  You got my license and you looked me up and

13   all that, correct?

14   A      Yes.

15   Q      That's what you stated.

16   A      Yes.

17   Q      What city -- what city was I born in?

18   A      What city were you born in?

19   Q      What city was on my license?

20   A      The Pennsylvania Department of Transportation lists you

21   have a residence in Pittsburgh, Pennsylvania, with the street

22   address of 52 South 8th Street.

23   Q      And how many letters in Pittsburgh?

24   A      I'm sorry?

25   Q      Are you good at math?

S. Langford - Cross

1    MR. CESSAR:  Objection, Your Honor.

2    THE COURT:  What's the --

3  BY DEFENDANT BANKS:

4  Q    The question is how many letters are in Pittsburgh?

5  The word, how many letters?

6  A    Ten, I think, if my math is correct.

7  Q    Okay.  Turn to Exhibit 1 again, please.

8  A    Yes, sir.

9  Q    Security question says:  City you were born in.

10 A    Okay.

11 Q    Count for me the letters of the answer.

12 A    It looks like there's eight asterisks there.

13 Q    You said there's eight asterisks in the answer and in

14 Pittsburgh, the city, there's 11 letters.

15 A    Okay.

16 Q    Correct?

17 A    I got ten letters.

18 Q    Right.  You're saying there's eight here and you're

19 saying in Pittsburgh --

20 A    There's more than eight, correct.

21 Q    Government Exhibit 16.

22 A    Yes.

23 Q    We were talking -- you were talking about this earlier,

24 talking about the subpoena from Sprint.  And in the account

25 details it gives a phone number.  Do you see it under account

S. Langford - Cross

1  contact numbers?

2  A       Yes.

3  Q       What is the phone number?

4  A       (412)441-7896.

5  Q       And is that the same number as the number that was used

6  on these account applications?

7  A       It does not match the phone number in Exhibit 1.

8  Q       Thirteen, Government Exhibit --

9  A       It does not match Exhibit 15.

10  Q       Thank you.

11  A       That phone number, 441-7896, does not match any number

12  on Exhibit 3.

13  Q       Does it, in fact, match any of the exhibits in this

14  courtroom?

15  A       No.  It doesn't.

16  Q       Please turn to Government Exhibit 13, Page 6.

17  A       Government Exhibit --

18  Q       Thirteen.  That was entered, correct, 13?  Do you have

19  it?

20  A       I don't have 13.

21          DEFENDANT BANKS:  Did you admit it?

22          MR. CESSAR:  Your Honor, Government Exhibit 13 will

23  be admitted into evidence through the probation officer.  It's

24  not been admitted.  I provided Mr. Banks a copy ahead of time.

25          DEFENDANT BANKS:  Okay.

S. Langford - Cross

1   BY DEFENDANT BANKS:

2   Q      All right.  Let's talk about then 15 and Government

3   Exhibit 1.

4   A      Okay, I have 15 and 1.

5   Q      Whose signature is on those exhibits authorizing the

6   opening of the account?  What signature is it?

7   A      Mr. Banks, this is a electronic online account opening

8   and there is no actual signatures on these account

9   applications.  This is a printed form --

10  Q      All I'm asking you is what signature is on those

11  exhibits.  That's the question.

12  A      There is no signature on these exhibits.

13  Q      Okay, thank you.  Let's go to 14, please.

14  A      Okay.

15  Q      Are you looking at four credit cards or -- four cards,

16  correct?

17  A      Correct.

18  Q      Okay.  TD Ameritrade, US Bank and Huntington, am I

19  right?

20  A      And Mastercard.

21  Q      And a Mastercard, correct?

22  A      Capital One.

23  Q      On three of the cards above the logo what does it say?

24  A      Above the Visa logo?

25  Q      Yes, and the Mastercard logo.

S. Langford - Cross

1    A      It says debit.

2    Q      And on what cards does it say that?

3    A      It says that on the TD Ameritrade Visa, US Bank Visa

4    card, and the Huntington Bank Mastercard.

5    Q      And what is the debit card, do you know?

6    A      Debit cards is like an ATM card which you can also use

7    as point of sale to purchase items from stores.

8    Q      And where does the money come from?

9    A      It should be backed by physical funds in a bank

10   account.

11   Q      So it's not a credit card, correct?

12   A      Debit cards are not credit cards.

13   Q      Okay.  You say you did a lot of investigations in fraud

14   cases.  Are you aware of the company called Capital One?

15   A      Yes.

16   Q      Are you aware that they offer a prepaid card?

17   A      I'm sure they do as a commercial product.

18   Q      Okay.

19   A      Typically they'll say debit cards; this one does not.

20   Q      Do we have the physical card here?

21   A      No.

22   Q      Where is it?

23   A      In FBI evidence.

24           DEFENDANT BANKS:  Your Honor, I'm going to move to

25   strike the Capital One because on the back of that card it

S. Langford - Redirect

1   says prepaid on it and we don't have the card here.  It's not

2   a credit card, it's a prepaid debit card.

3           MR. CESSAR:  Objection, Your Honor.  The burden is

4   on the Defendant to prove that.

5           DEFENDANT BANKS:  I can't prove that if you don't

6   bring the exhibit.  This is not an exhibit.

7           THE COURT:  If you have the original --

8           MR. CESSAR:  I'll have to find it.

9           THE COURT:  You can find it and bring it, okay?

10  We're probably going to have to continue this hearing given

11  the length of time it's taking today.

12          DEFENDANT BANKS:  That's pretty much all I got for

13  this witness, Your Honor.

14          MR. CESSAR:  Just a few questions, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MR. CESSAR:

17  Q     Mr. Banks was asking you about Government Exhibit 4,

18  and you indicated that under the account -- amount, account

19  suffix 0906, correct?

20  A     Yes, sir.

21  Q     And if you look at Government Exhibit 19, that was one

22  of the accounts in First Niagara opened by Mr. Banks.

23  A     Yes, sir; correct.

24  Q     0906.

25  A     Correct.

S. Langford - Redirect

1    Q      Mr. Banks also inquired about the Sprint information

2    that was subpoenaed, Government Exhibit 16.

3    A      Yes, sir.

4    Q      What number was the subject of the subpoena?

5    A      The subpoena was the phone number of (412)515-9670.

6    Q      And that is the number contained on the applications,

7    the Forex applications at Government Exhibit 1 -- if you can

8    help me out here, Agent.

9    A      Sure.  It is on Government Exhibit 1, but it also is on

10   Exhibit No. 15, and is also listed on Frederick Banks's

11   monthly supervisory report issued under penalty of perjury to

12   the US Probation Office.

13   Q      Thank you.  And there was also additional questions

14   regarding the password for the one account and whether there

15   were eight or ten letters.

16   A      Correct.

17   Q      Do you know where Mr. Banks was born?

18   A      No, I don't.

19   Q      But you do know his Pittsburgh driver's license says

20   where he resides today.

21   A      Correct.

22   Q      So there's no correlation between the two.

23   A      None.

24   Q      And just so we're clear on the record there was some

25   inquiry about Government Exhibit 6.  This was provided after

S. Langford - Recross

1   the recorded conversation between Gain Capital and somebody

2   purporting to be Freddie Banks.

3   A        I don't know that, the timing of when Gain Capital

4   received this particular document in relation to the recorded

5   phone call.  The account was frozen pending substantiation of

6   the funds in the account and I -- speaking with the

7   Gain Capital representatives, this phone call -- when they

8   relate and mentioned the account statement being provided in

9   the recording, this is the document that they're referring to.

10  This is the only document that was provided by, purportedly,

11  Freddie Banks in order to substantiate the funds, ACH deposit

12  into the account.

13              MR. CESSAR:  No further questions, Your Honor.

14              THE COURT:  Anything?

15              DEFENDANT BANKS:  I just want to ask a brief

16  question.

17                    RECROSS EXAMINATION

18  BY DEFENDANT BANKS:

19  Q        You said you looked at my -- an individual named

20  Freddie Banks and pulled the information, correct?

21  A        Repeat the question.

22  Q        You talked earlier about getting information on

23  Freddie Banks, is that correct?

24  A        Freddie Banks.

25  Q        Freddie, F-R-E-D-D-I-E, correct?

1   A       Yes.

2   Q       What was the maiden name on the name?

3   A       The information that I received was both open source

4   and law enforcement databases.  I specifically ran the Social

5   Security number and it came back to a Freddie Banks.  That

6   number has been indicated by the Social Security

7   Administration that the individual issued that Social Security

8   number is deceased.

9   Q       Right.  What was Freddie Banks's maiden name, do you

10  know?

11  A       I don't have it here -- maybe.

12  Q       Can we stipulate that it was Brown?

13  A       No.

14          MR. CESSAR:  I prefer the agent determine that.

15          THE WITNESS:  I don't have those records with me

16  right now.

17          DEFENDANT BANKS:  Okay.  No further questions.

18          MR. CESSAR:  May this witness be excused,

19  Your Honor?

20          THE COURT:  Yes, he may, subject to recall if

21  there's any question about the original of the one card for

22  Capital One.

23          MR. CESSAR:  Yes, Your Honor.  We were going to call

24  the probation officer, but you had indicated we're -- we can

25  hold off on that until --

B. Orrison - Direct

1        THE COURT:  Why don't we get started.

2        MR. CESSAR:  Okay.

3        (Dr. Wettstein exited the courtroom.)

4        MR. CESSAR:  At this time the Government calls

5   Mr. Ben Orrison.

6                        *  *  *  *  *

7        BEN ORRISON, a witness herein, having been first

8   duly sworn, was examined and testified as follows:

9                    DIRECT EXAMINATION

10       THE COURT:  Thank you, please take the stand.

11  BY MR. CESSAR:

12  Q       Would you please state your name for the record.

13  A       Sure.  It's Benjamin Orrison, O-R-R-I-S-O-N.

14  Q       And by whom are you employed, sir?

15  A       The United States Probation Office.

16  Q       And how long have you been so employed?

17  A       In a variety of capacities since 2009.

18  Q       And at some point did you become the supervisory

19  probation officer for Mr. Frederick Banks?

20  A       That is correct.

21  Q       And was that on two different court cases?

22  A       Yeah, two different criminal cases.

23  Q       Criminal numbers.  And have you had occasion to meet

24  with him?

25  A       I have.

B. Orrison - Direct

1   Q      You've talked to him?

2   A      Yep.

3   Q      You've heard his voice?

4   A      That's correct.

5   Q      Did you hear Government Exhibit 9 in this courtroom?

6   A      The recording?

7   Q      The recording.

8   A      Yes.

9   Q      Whose voice is that?

10  A      Fred Banks.

11  Q      Now, at some point when you began your supervision or

12  when anybody -- when a Defendant comes out of prison and

13  begins their supervision, do they meet with the probation

14  officer and go over the judgment and commitment order?

15  A      They do.

16  Q      Okay.  And did somebody from the Probation Office do

17  that with Mr. Banks?

18  A      Yes.

19  Q      And I'd like you to look at Government Exhibit 13.  I

20  believe you have a copy of that.  Is that a copy of the

21  judgment and commitment order that was reviewed with

22  Mr. Banks?

23  A      It was.

24  Q      Okay.  It wasn't you that did that, though, correct?

25  A      Correct.

B. Orrison - Direct

1   Q      Okay.  Now, in your supervision of Mr. Banks, have you
2   heard of a company called Hexagon Records?
3   A      I have.
4   Q      What do you know about Hexagon Records?
5   A      On his -- on his written monthly reports he would refer
6   to Hexagon Records as his employment.  And looking back
7   through his old presentence report, Hexagon Records was
8   mentioned in the body of the report.
9   Q      And was Mr. Banks required to provide to you monthly
10  reports of supervision?
11  A      Yes.
12  Q      Did he provide those to you?
13  A      Yes.
14  Q      Okay.  And if you could, I provide you Government
15  Exhibits 10, 11 and 12, if you could identify those.
16  A      Ten, 11 and 12 are all written monthly supervision
17  reports.
18  Q      And on each one of those reports which have previously
19  been admitted did Mr. Banks certify that all the information
20  furnished was complete and correct?
21  A      He did through his signature on the back of all the
22  reports.
23  Q      Okay.
24         DEFENDANT BANKS:  Could you repeat that question?  I
25  didn't really hear it.  Repeat the -- the question and the

B. Orrison - Direct

1   answer?

2          MR. CESSAR:  I'll repeat the question.

3   BY MR. CESSAR:

4   Q     Did Mr. Banks sign each of these forms:  I certify that

5   all information as furnished is complete and correct?

6   A     That's correct.

7   Q     Okay.  Now, sir, if you look at Government Exhibits 10,

8   11 and 12, and if you look at Government Exhibit 10 first,

9   does Mr. Banks reflect having any checking or savings

10  accounts?

11  A     Yes, on both.

12  Q     Okay.  What does he reflect?

13  A     An account through First Niagara and a Wells Fargo

14  savings account.

15  Q     It reflects a balance there, doesn't it?

16  A     It does.

17  Q     And it says:  Attach a complete listing of all other

18  financial account information if you have multiple accounts.

19  A     That's correct.

20  Q     Did he ever tell you he was opening an account at

21  Gain Capital?

22  A     He did not.

23  Q     If you look at Exhibit 10 or Exhibit 11, same section,

24  does he indicate --

25  A     He indicates First Niagra and Wells Fargo accounts.

B. Orrison - Direct

1   Q      No Gain Capital?

2   A      No Gain Capital.

3   Q      Government Exhibit 12, likewise.

4   A      The same First Niagra and Wells Fargo accounts.

5   Q      No Gain Capital?

6   A      No.

7   Q      Should he have disclosed this to you?

8   A      Yes.

9   Q      If you could look at Government Exhibit 14, sir, which

10  I will provide to you, a copy of some debit and credit cards.

11          MR. CESSAR:  And, Your Honor, this will be subject

12  to providing additional information, the back of the card,

13  okay?

14          THE COURT:  Okay.

15  BY MR. CESSAR:

16  Q      There's a Mastercard there from -- do you see the cards

17  there?

18  A      Yes.

19  Q      Where is the Mastercard from?

20  A      Looks like there's two on there, the one through

21  Capital One and the other one through Huntington.

22  Q      The one Huntington indicates it's a debit card,

23  correct?

24  A      Correct.

25  Q      Is there an indication that the Capital One account is

B. Orrison - Direct

1    a debit card?

2    A       No.

3    Q       Were you aware that Mr. Banks --

4            DEFENDANT BANKS:  Your Honor, I'm going to object

5    because I think we should have that exhibit before he can --

6    he can even ask these questions in front of us.

7            THE COURT:  We'll postpone that question because he

8    will have to come back.

9            MR. CESSAR:  Okay.  I have one more question.

10           THE COURT:  Okay.

11   BY MR. CESSAR:

12   Q       Now, when you supervised Mr. Banks, did you have to

13   visit him at his home?

14   A       I did.

15   Q       What was that address?

16   A       52 South 8th Street, Pittsburgh, PA, 15203.

17   Q       And did you see computers and/or other equipment that

18   would be able to be used to access the Internet?

19   A       During a walk-through on one of the visits I confronted

20   Fred on -- after seeing two -- what I felt were computers in

21   his residence.

22   Q       Okay.  And you asked him about them?

23   A       Yes.

24   Q       And what did he tell you?

25   A       He advised me that he had purchased -- well, initially

B. Orrison - Cross

1   he had said the -- the agents -- it was computers the agents

2   returned from his instant offense.  And then he -- I advised

3   him that the netbook looked -- or what appeared to be a

4   netbook is too new to be what the agents returned to him in

5   2004.  And he advised he had purchased that while in the

6   halfway house.

7            MR. CESSAR:  No further questions, Your Honor.

8                        CROSS EXAMINATION

9   BY DEFENDANT BANKS:

10  Q     Let's go to 10, 11 and 12, all briefly.

11  A     Okay.

12  Q     And under the net earnings from -- do you have the

13  checking account, that section?

14  A     Yes.

15  Q     It says checking account or savings account on all the

16  exhibits, correct?

17  A     That is correct.

18  Q     Okay.  You just heard the FBI agent testify that a

19  fourth account is a trading account, correct?

20  A     I --

21            MR. CESSAR:  I don't believe the agent testified to

22  that, Your Honor.  I don't think --

23            DEFENDANT BANKS:  Your Honor, I asked if the -- the

24  agent if the one account was a trading account.  I

25  specifically talked about if that required cash, and he said

B. Orrison - Cross

1  it was.

2          THE COURT:  It required some funding.

3          DEFENDANT BANKS:  Yes, funding to open a trading

4  account.  And what I'm asking the -- what I'm asking -- I'm

5  sorry, Ben, I don't know his last name, the US probation

6  officer here is that --

7  BY DEFENDANT BANKS:

8  Q      You heard him say that a fourth account was a trading

9  account, correct?

10 A      I did hear that today.

11 Q      Okay.  And in this section it says checking account,

12 savings account; it says nothing about a trading account, does

13 it?

14 A      It says attach a listing of all other account

15 information.

16 Q      That was non-responsive -- okay.  Let me go to -- let

17 me go to -- let's stay here for a second.  At the very top,

18 whose handwriting is that?  See where it scratches off

19 October?  October is what I wrote, and then I seen August

20 above that.

21 A      That is correct.  I corrected that.

22 Q      Okay.  But when I submitted the statement, do you

23 realize that I meant to submit it for October because I was --

24 I was submitting statements ahead, in advance?

25 A      I don't really recall what you're --

B. Orrison - Cross

1    Q       What I'm asking you is I submitted my reports and at

2    the same time, according to the exhibit, I sent money to the

3    Clerk of Court.  Like on Government Exhibit 10 I submitted it

4    in October, which was scratched out -- or I submitted it for

5    October, I should say, for October, which is scratched out.

6    And I indicated that -- let's see here --

7                THE COURT:  What exhibit are you looking at?

8                DEFENDANT BANKS:  Exhibit 10, Your Honor.

9    BY DEFENDANT BANKS:

10   Q       And I indicated at the same time that I made a payment

11   towards restitution in the amount of 20 cents on Page 2.

12   Correct?

13   A       Correct.

14   Q       Okay.  So -- and then we have on 11 -- we have my month

15   scratched out and written in there is August.  Is that you as

16   well?

17   A       That is me as well.

18   Q       Okay, all right.  Let's go to the amended judgment

19   which is Government Exhibit 13.

20   A       Okay.

21   Q       On Page 6, please, you see schedule of payments,

22   correct?

23   A       Page 6 -- where at?

24   Q       Page 6 on the amended judgment in this case.  It's

25   Government Exhibit 13.  Do you have it?

B. Orrison - Cross

1   A      I have 13 --

2   Q      Okay, Page 6 at the top.  It's page 6 of 6.

3   A      Where it says schedule of payments?

4   Q      Yes.

5   A      Okay.

6   Q      What is filled out in that section on the schedule of

7   payments?

8   A      Looks like for Part F, special instructions regarding

9   the payment --

10  Q      Not the special instructions.  In A, B, C, D, E, where

11  they're supposed to put the schedule, what's filled out?  Is

12  there anything filled out in that section?

13  A      There is nothing filled out.

14  Q      Okay.  And you're aware -- are you aware that the Court

15  had -- the Judge has to set the payment schedule?  You can't

16  set it, are you aware of that?

17  A      Yes.

18  Q      Okay.  Now, let's go to Government -- I don't know what

19  exhibit it is, but the supplemental petition.  I'm not sure

20  what the number is on that.  I have it here; I don't have the

21  marking on it.

22         MR. CESSAR:  Your Honor, we did not admit the

23  supplemental petition as an exhibit.

24         DEFENDANT BANKS:  I want to move to admit it because

25  I need to ask him a question on it -- one or two questions on

B. Orrison - Cross

1    the supplemental.

2           THE COURT:  It's a matter of -- I can take judicial

3    notice of it, so you can show it to him.

4           DEFENDANT BANKS:  Okay.

5    BY DEFENDANT BANKS:

6    Q     Under the special conditions, it's -- well, first off,

7    let me say this.  Under the special conditions on Page 1, it's

8    like the third condition, it says:  Restitution to be paid in

9    monthly installments of -- I guess NLT, which is not less

10   than, is that correct?

11   A     That is correct.

12   Q     Ten percent of gross monthly income.  See that?  You

13   don't see it, but you remember it saying that?

14   A     That's common in those judgment and commitment orders.

15   Q     Okay.  And on Page 2 of the petition it says

16   United States probation officer, and that's your signature?

17   A     In the supplemental petition?

18   Q     Yeah, on the second page, where you sign.

19   A     I should have one of the signatures on there, yes.

20   Q     And it says supervising US probation officer, and

21   that's the supervising US probation officer's signature?

22   A     Yes.

23   Q     And it says:  I declare under penalty of perjury that

24   the forgoing is true and correct.

25   A     That's correct.

B. Orrison - Cross

1  Q      So you signed it under perjury.

2  A      I didn't sign anything under perjury.

3  Q      What I'm saying is this section, it says:  I declare

4  under penalty of perjury --

5          THE COURT:  I'm just going to -- because we're

6  running out of time, I want you to look at the additional

7  supervised release terms that are a part of Exhibit No. 13.

8  And this would be No. 3.

9          DEFENDANT BANKS:  Okay.  I didn't -- I didn't notice

10  that.

11         THE COURT:  Okay.  Thank you.

12  BY DEFENDANT BANKS:

13  Q      Now, according to 10, 11 and 12, and like I said at the

14  top, I'm sending this in advance, and one has October, et

15  cetera.  Were you aware that I was submitting these through

16  the mail in advance?

17  A      The monthly reports are typically submitted for the

18  summary of the previous month.  And many people make that

19  mistake of either putting the month -- the current month or a

20  future month, not understanding, and more than just your

21  occasion I routinely fix that --

22  Q      Right.

23  A      -- to accurately reflect.

24  Q      I understand.  Were you aware you were getting multiple

25  reports in the same month and they were coming in as advance

B. Orrison - Cross

1   reports because of the way I labeled them?

2   A      I was not aware of that.

3   Q      Okay.  Well, were you aware that I was paying money to

4   the Clerk of Courts?  Did you ever check with the Clerk of

5   Courts?

6   A      I've -- I -- I pull up -- it's a system we work through

7   the clerks with, and I review that periodically.

8   Q      Did you see money coming in for me at the Clerk of

9   Court?

10  A      It was coming in at some points, but I think it was

11  being put towards your special assessment fee.

12  Q      Right.  But there was money being paid; you saw it, for

13  this case, at the Clerk of Court; correct?

14  A      There was occasions where 20 cents or a dollar.

15  Q      Right -- did those money amounts match these 10 or 11

16  or 12 exhibits that came in to the clerk?

17  A      Are you referring to where you indicated whether you

18  paid it or not?

19  Q      Yes, and the amount I paid.

20  A      It seems like it.  I can't recall exactly if they're

21  right.

22  Q      Are you aware if I'm in compliance with the payment

23  schedule, I would not need your permission to open a credit

24  account?

25  A      The payment schedule is at ten percent and based off of

B. Orrison - Cross

1  your earnings.   Ten percent is not what you were paying.

2  Q       Do you recall at the Magistrate Judge hearing you state

3  under oath when you were on the stand that I was unemployed?

4  Do you recall that?

5  A       I do recall that.

6  Q       Okay.  If I'm unemployed, what is ten percent of zero?

7  A       Zero.

8  Q       And how much did I pay?

9  A       Slightly more than that.

10  Q       Okay.  Then I was in compliance, correct?  Under that

11  standard.

12            MR. CESSAR:  Your Honor, we're talking apples and --

13  I have no idea what's going on, but I don't see why it's

14  relevant.  Also we don't have the records as to what he

15  actually paid, and he's asking the witness to testify to

16  things he can't really verify.

17            DEFENDANT BANKS:  Your Honor --

18            THE COURT:  The witness has said that he had checked

19  into that.  So at this stage it's really a question about

20  whether or not he had any income during these periods for the

21  condition to be imposed.

22            DEFENDANT BANKS:  And what I was getting to,

23  Your Honor, as you know, is that I was indicating that I was

24  compliant with the payment schedule; therefore, I didn't need

25  his permission to open any credit account.  And on top of

B. Orrison - Redirect

1   that, none of these accounts that were allegedly opened are

2   credit accounts.  None of them.

3          No further questions.

4          MR. CESSAR:  If I can real quickly?

5          THE COURT:  Okay.

6                    REDIRECT EXAMINATION

7   BY MR. CESSAR:

8   Q      I think you indicated this.  Government's 10, 11 and 12

9   are not to be submitted prospectively based upon what may

10  happen two or three months in advance, correct?

11  A      That's correct.

12  Q      This is supposed to reflect what actually happened here

13  and now, today, at the time of the report.

14  A      Typically we are supposed to get them the first five

15  days of the month and they're supposed to reflect what

16  happened the previous month.

17  Q      And each of these has a received stamp which reflects

18  when they were received, correct?

19  A      That is correct.

20  Q      Okay.  And if you look at Government Exhibit 10, does

21  Mr. Banks indicate he had net earnings from employment?

22  A      He reflects on 10 $84.

23  Q      Government Exhibit No. 11, does he indicate net

24  earnings from employment?

25  A      $180.

B. Orrison - Redirect

1    Q        And then on Government Exhibit 12, total monthly cash

2    inflow, $600?

3    A        That's what it was.

4    Q        It says minimum wage?

5    A        Yes.

6    Q        It says he's employed by McDonald's?

7    A        Correct.

8            MR. CESSAR:  No further questions, Your Honor.

9                        RECROSS EXAMINATION

10   BY DEFENDANT BANKS:

11   Q        Does it indicate anywhere on these monthly supervision

12   reports that I cannot send them in in advance?  Does it say it

13   anywhere?

14   A        Not to my -- no.

15   Q        Do you recall me asking you for me to -- that I could

16   apply for Second Chance Act money and also for a URA loan so I

17   could get my lights turned on, my gas turned on, my water

18   turned on, and my roof fixed?  Do you recall that?

19   A        I recall that, yes.

20   Q        What was your answer to that?

21   A        I said based off of the history of fraud and the lack

22   of income that I couldn't approve you obtaining the loan

23   necessary for the grant.  And you were advised that there was

24   no Second Chance money available at the time.

25   Q        Do you recall that I lived in the residence for

B. Orrison - Redirect

1   probably one -- one to two months without power, but I did

2   have water; no power, no gas.  Do you recall that?

3   A        I recall coming up to your residence and there being

4   issues with utilities.

5   Q        Do you recall that as a result of that, of me not

6   having enough money to get things turned on because I had to

7   have major repairs done, that you told me I didn't have to

8   worry about paying the ten percent?

9   A        I advised you that although I couldn't permanently

10  change your restitution schedule, that I could have some

11  flexibility and allow you to put more money towards your home

12  as opposed to paying towards restitution initially.

13  Q        Yes.  And do you recall as a result of that I wasn't

14  compliant at the time that these were submitted because you

15  gave me permission to not have to pay as much because you knew

16  I was trying to get my utilities restored because the

17  Government would not give -- let me apply for a loan and would

18  not give me Second Chance Act money that I was entitled to, a

19  federal inmate released from prison?

20  A        I also supervise you at Criminal No. 03, and that one

21  you are -- you are to get my permission before you open a line

22  of credit.  The 2004 one does say if you're in compliance; but

23  the 2003 criminal case says it needs to be approved by the

24  Probation Office.

25  Q        Right.  But that case is not before Your Honor right

1    here.  We're only talking about the Judge Conti --

2    A      I supervise you on both criminal matters.

3    Q      This hearing is only concerned with the Judge Conti

4    matter.

5    A      That's correct.

6    Q      Okay.  So all I'm saying is that you gave me permission

7    to not have to pay the full ten percent based on I was trying

8    to get my power restored.  You recall that.  And I'm just

9    saying that since you did that, I was in compliance with the

10   schedule at the time these were submitted.

11   A      You were in compliance with my directive?

12   Q      Yes.

13   A      My directive, yes.

14   Q      Yes.  And do you recall that at one point the Clerk of

15   Courts sent me a letter telling me not to send in change

16   because they don't want to take change?  That's what I was

17   e-mailed about because that's all I had?

18   A      I was not privy to any correspondence with the Clerk of

19   Courts.

20            DEFENDANT BANKS:  Okay.  No further questions.

21            THE COURT:  Okay.  How much longer do you think you

22   will need?

23            MR. CESSAR:  I'm done.

24            THE COURT:  You're done, okay.

25            So, Mr. Banks, how much longer do you think you'll

1   need?

2           DEFENDANT BANKS:  I don't have any further questions

3   to ask.

4           THE COURT:  All we have is this question of the

5   credit card, is that correct?  Maybe we can come back at 2:00

6   today.  We have just that discrete issue -- 2:15.

7           DEFENDANT BANKS:  Your Honor, I think we can resolve

8   it because all we have to do is go to CapitalOne.com and the

9   prepaid card or secure card, and it's going to come right up.

10  They have prepaid.

11          THE COURT:  I don't have that printed.

12          DEFENDANT BANKS:  It's just on the web site.

13  Anybody can go in there online, type it in, CapitalOne.com, do

14  a search for secure credit card, prepaid card.  I even have a

15  case right here I can read into the record that says that

16  Capital One is the largest issuer of debit cards in the

17  United States.

18          THE COURT:  They may be, but they also issue credit

19  cards.

20          DEFENDANT BANKS:  They issue credit cards and debit

21  cards.  This is a prepaid --

22          THE COURT:  We don't know that unless we see --

23  you're saying --

24          DEFENDANT BANKS:  I believe it is, but I'm saying if

25  there's not -- there is no way to tell by that number it's a

1  prepaid card unless we get a representative here from

2  Capital One; but it was a prepaid card just like my

3  AmericanExpressCard.com/prepaid was also a prepaid card that

4  they didn't bring up.

5          MR. CESSAR:  Quite frankly, it's irrelevant because

6  this probation officer testified that Mr. Banks should have

7  provided to him information about Gain Capital.  He has

8  testified on the record --

9          THE COURT:  It's a question of whether he has

10  violated the one condition that has to do with whether or not

11  he was opening credit or lines of credit; and a debit card is

12  not a line of credit and not a credit card.  That is really a

13  question about --

14          MR. CESSAR:  We'll be back at 2:15 with the back of

15  the card.

16          DEFENDANT BANKS:  And all these cards are outside

17  the scope because they didn't put it in any of the petitions.

18  This card business he brought in later.  He never served me

19  with any of this until now, and he brought it in and it's

20  not in the supplemental petition, Your Honor, it's not in the

21  petition.

22          THE COURT:  It's a separate matter.

23          DEFENDANT BANKS:  It's a waste of time because it is

24  a debit card -- a prepaid card.  I'm not convinced -- I'm

25  saying from memory I believe that on the back it's going to

1  say that, but I can't be one hundred percent certain; but I

2  can tell you that it's not a credit card.

3          MR. CESSAR:  I'll do whatever --

4          THE COURT:  It was not identified in the --

5          MR. CESSAR:  Correct.

6          THE COURT:  -- in the petition.

7          MR. CESSAR:  Correct.

8          THE COURT:  Or the supplemental petition.

9          MR. CESSAR:  Correct.

10          THE COURT:  Okay.

11          MR. CESSAR:  The core of this case is

12  misrepresentations and the identity theft of Mr. Corcoran,

13  Freddie Banks, for this man to open up those accounts.

14          THE COURT:  It's the Class B violation.

15          MR. CESSAR:  The Class B violation.  That's really

16  why we're here.  Quite frankly, you could decide that now if

17  you wanted to, Your Honor.

18          THE COURT:  Okay.  So we'll -- you're withdrawing at

19  this stage the violation with respect to the credit card?

20          THE WITNESS:  Based off of everything today, I

21  believe we could.

22          THE COURT:  Okay.

23          MR. CESSAR:  Fine.

24          THE COURT:  So then all we have is the -- is there

25  going to be any other evidence or submissions with respect to

1  whether there is a violation of the condition that you should

2  not commit another federal, state or local crime?

3          MR. CESSAR:  Correct, Your Honor.

4          THE COURT:  Okay.

5          DEFENDANT BANKS:  Could you issue some kind of

6  order, just putting that in writing, that they withdrew this,

7  that section?

8          THE COURT:  It's so ordered on the record.

9          DEFENDANT BANKS:  Okay.

10          THE COURT:  Okay?  So at this stage, Mr. Banks, do

11  you have anything that you wish to -- any evidence or -- that

12  you wish to bring to the Court's attention with respect to the

13  alleged violation of the condition that you shall not commit

14  another federal, state or local crime?

15          DEFENDANT BANKS:  Can I speak on the record?

16          THE COURT:  What?

17          DEFENDANT BANKS:  Can I speak on the record?

18          THE COURT:  As an attorney?

19          DEFENDANT BANKS:  Yes.

20          THE COURT:  As representing yourself.

21          DEFENDANT BANKS:  I can't testify --

22          THE COURT:  You can testify if you choose to do so,

23  but I would urge to you consult with your standby counsel

24  first because there may be forthcoming actual criminal charges

25  related to these matters.  I don't know about that other than

1    what have been referred to as things were coming from

2    subpoenas to a Grand Jury.

3              DEFENDANT BANKS:  Well, since they withdraw all

4    that, I have my -- I have my American Express and my green --

5    I have some stuff showing these were prepaid cards.  I don't

6    have anything that shows Capital One is a prepaid card.

7              THE COURT:  They've withdrawn that so we don't need

8    to worry about that.

9              DEFENDANT BANKS:  I really don't have anything

10   further.

11             THE COURT:  Okay.  So you're going to rest, too?

12             DEFENDANT BANKS:  Yes.

13             THE COURT:  Okay.  So at this stage what I would

14   like from the Government, perhaps we could come back today at

15   2:15 and I'll hear the closing arguments.  How does that

16   sound?

17             DEFENDANT BANKS:  All right.

18             THE COURT:  Okay?  So we'll be in -- we'll be

19   adjourning and be returning at 2:15 for some closing

20   arguments.  I would like at that stage, if you wouldn't mind,

21   to be clear as to what the elements are of the crimes that the

22   Defendant is alleged to have violated, and what is the

23   evidence that's going to address each of those particular

24   elements.  There are several crimes, as to how that would play

25   out.  I think that's important.

1          So, Mr. Banks, you should be aware of that as well,

2   so looking at what the elements of these offenses are.  And I

3   believe what the Government is alleging -- let's just be clear

4   on this -- that the first petition identifies the wire fraud

5   and aggravated identity theft as the two offenses.

6          MR. CESSAR:  Correct, Your Honor.

7          THE COURT:  And then the supplemental one, that only

8   relates to the Gain Capital accounts, okay?  So it's really

9   just the initial petition that we're addressing at this stage.

10          DEFENDANT BANKS:  Can we leave our stuff here?

11          THE COURT:  What?

12          DEFENDANT BANKS:  Can we leave our items here?

13          DEPUTY MARSHAL:  I was actually going to ask that --

14          THE COURT:  I don't have another proceeding in here,

15   so if you would like to --

16          MR. CESSAR:  I killed a lot of trees to print that

17   stuff out.  Can I have that back, the stuff -- all the

18   pleadings that you filed?

19          THE COURT:  He needs to make a copy of that.

20          MR. CESSAR:  I don't know if I'll be able to get

21   done by then.

22          DEFENDANT BANKS:  Can I use it for closing argument?

23          MR. CESSAR:  Can I leave that here, all public

24   pleadings, but I'll remove everything else.

25          THE COURT:  Okay, that's fine.

1          DEFENDANT BANKS:  So I'll leave --

2          THE COURT:  You can leave your things.

3          (Whereupon, the luncheon recess was taken.)

4          (In open court.)

5          THE COURT:  Before we go into the argument, I want

6    to circle back on a couple of the objections that have been

7    made by Mr. Banks.

8          The first was the question of the admissibility of

9    hearsay.  And as the Court had noted, hearsay is admissible;

10   and I just need to go through what the Court of Appeals for

11   the Third Circuit says about that and what the standard is

12   that the Court utilizes.

13         In United States versus Lloyd, 566 F.3d 341,

14   Third Circuit, 2009, the Court held on Page 344:  We now hold

15   that a District Court should apply a balancing test in

16   revocation hearings when considering the releasee's asserted

17   right to cross examine adverse witnesses.  And that the Court

18   is to balance the person's interest in the constitutionally

19   guaranteed right to confrontation against the Government's

20   good cause for denying it.  The reliability of proffered

21   hearsay is a principal factor although not the sole factor

22   relevant to the releasee's interest in confrontation.  To

23   outweigh this interest the Government must in the typical case

24   provide good cause for a hearsay declarant's absence.

25         As the language of the advisory committee indicates,

the releasee's interest in the confrontation which encompasses
reliability is an independent factor that should be analyzed
separately from cause.   In some cases the releasee's interest
in confrontation may be overwhelmed by the hearsay's
reliability such that the Government need not show cause for a
declarant's absence.   Accordingly, we reject a per se rule
that a District Court's failure to explicitly address cause
amounts to reversible error in all cases.

          Nevertheless, a releasee may have a legitimate
interest in confrontation and cross examination even when the
declarant's out-of-court statement bears some indicia of
reliability; and district courts should normally address both
factors when relying -- when ruling on the admissibility of
hearsay evidence in a revocation hearing.

          So at this stage I think in order to make a record
here I think it would be appropriate in terms of the Court
identifying the particular hearsay evidence that came in and I
need to make a finding about reliability and about cause.

          So we'll turn to the Government in terms of the
evidence that you adduced that was hearsay.   There's at least
two of those.   One was the conversation with the individual at
Gain Capital, and the second was at a minimum Mr. Corcoran,
whose testimony was at issue.   And I think there was some
business records that were received, and those business
records would be an exception to the hearsay rule.

1          However, there was certain evidence from third

2     parties -- let me get the name -- the name of the company

3     correct -- was it Gains Capital?

4          MR. CESSAR:  Gain Capital.

5          THE COURT:  Gain Capital.  There were statements

6     being made to the Special Agent from people at Gain Capital,

7     so those would be hearsay.  Even though the underlying

8     documents may come in, those would be hearsay.

9          MR. CESSAR:  I would say that the underlying

10    documents come in as business records, Your Honor, kept during

11    the regular course of business.  As to Government Exhibit 79,

12    which is the tape, the indicia of reliability is Mr. Banks's

13    own voice on the tape talking to a representative of

14    Gain Capital.  And as stated by the agent, that's a copy

15    maintained -- recorded by Gain Capital for their use and they

16    provided us pursuant to a Grand Jury subpoena.  So I think

17    again the indicia of reliability is very good on that.

18          As to the statements made by Gain Capital, they're

19    corroborated by the documents.  The agent was merely putting

20    them into context for what the documents were.

21          As to account 0906, remember there was the issue on

22    the one exhibit about was that First Niagra.  The agent I

23    think explained that in the context of the records.  You know,

24    we hewed very closely to the records.  This closing argument

25    is refer to the record, refer to the record, refer to that

1    record.   So maybe that addresses your issues?

2              THE COURT:  Okay.  And how about Mr. Cameron?

3              MR. CESSAR:  We just tracked him down.

4              AGENT LANGFORD:  Corcoran.

5              MR. CESSAR:  Excuse me one second, Your Honor.

6              (Off the record discussion.)

7              MR. CESSAR:  He works third shift, Your Honor.  We

8    weren't able to get him today.

9              THE COURT:  What does third shift mean?

10             MR. CESSAR:  He works at night and he's asleep now.

11   So -- if we look at the facts that we have in this case --

12             THE COURT:  How about the people from Gain Capital?

13   Why weren't they able to come?

14             MR. CESSAR:  They're in New Jersey.  We didn't think

15   we needed to call them because we were relying upon the

16   records.  By and large we relied upon the records and what the

17   agent adduced from the records both from Gain Capital and from

18   the Probation Office records and any other records obtained

19   pursuant to third party subpoena.

20             THE COURT:  Okay.

21             Do you wish to be heard on that?

22             DEFENDANT BANKS:  Yes, I do, Your Honor.  I think

23   it's ridiculous.  I can appreciate you're relying on the

24   records; however, I'm in prison.  I'm trying to get out of

25   prison.  So I can understand the prosecutor has his steak

1  dinners; he can eat steak every night.  I can't do that.  They

2  have to have these people here to introduce this stuff.  They

3  have my -- you're saying it's my voice going across this

4  courtroom out into the public here, and they don't have a

5  representative of this, quote, unquote, Michael to even put

6  this stuff in.  It's ridiculous.

7          And the same case you cited, I have it right here on

8  the paper, US versus Lloyd.  And there's about three other

9  cases that they cite, right here.  It's -- it's -- let's see

10  here.  It's USA versus Mitts, 2013 case, US Appeal Exit 1006,

11  Third District, 2013, right out of this district.  They cannot

12  do that.  I have a right to confrontation, to have somebody

13  here.  This is what I said before, to introduce this stuff and

14  to speak on it so I can cross examine them and challenge the

15  validity of their statements.

16          THE COURT:  I'm going to find that the documents

17  from Gain Capital have indicia of reliability.  They were

18  submitted pursuant to -- we have the testimony of the

19  Special Agent that there were subpoenas directed to

20  Gain Capital.  These were the documents produced from

21  Gain Capital, and they are business records, so that they do

22  show indicia of reliability in terms of how they were obtained

23  and the nature of the documents themselves.

24          With respect to the recording itself, I am familiar

25  with Mr. Banks's voice.  I presided over his trial.  He's --

1  now this is the second day for this hearing; I'm familiar with

2  his voice and I can tell from the tape that that is his voice

3  on the tape.

4       Now, the -- with respect to Mr. Cameron, I think

5  that's a little different situation.  Someone -- the Court has

6  said that this is from Lloyd at Page 345.  If something is

7  replete with detail, which we have with respect to the records

8  and the tape, there's corroborating evidence, those are things

9  that can be recognized as reliable.  And now out-of-court

10  statements reflecting an adversarial relationship with the

11  accused or containing multiple layers of hearsay have been

12  recognized as unreliable; and here you have Mr. Cameron who

13  did have an adversarial relationship with the Defendant years

14  and years ago.

15       And we're -- I think he should be here because these

16  are not sworn; that's another thing that courts take into

17  account when they look at these matters, if they are

18  statements that were given under oath or there was something

19  else like that.

20       Do you want me to leave the record open?

21       MR. CESSAR:  No, we'll proceed.

22       THE COURT:  Okay.  Without the aggravated identity

23  theft.

24       MR. CESSAR:  No, no, no.  Because we have aggravated

25  identity theft in regards to Mr. Corcoran, because we have an

1  application from Mr. Corcoran, we have his driver's license

2  found in Mr. Banks's possession, and we have some of the

3  information on the Corcoran application relating back to

4  Mr. Banks.  It has nothing to do with Mr. Corcoran and I would

5  argue --

6          THE COURT:  It has to be a real person.  You have to

7  show it was a real person, is that -- and you're saying that

8  the evidence on the driver's license is sufficient to show

9  that?

10         MR. CESSAR:  I would say the agent could testify he

11  met a real person, Adam Corcoran; he can testify to that.  He

12  doesn't need to go into what Corcoran said.

13         THE COURT:  We won't give any weight to

14  Mr. Corcoran's out-of-court statements.

15         MR. CESSAR:  And in addition, there was aggravated

16  identity theft in regards to Mr. Banks's deceased mother

17  because he used her Social Security number to open up the

18  Freddie Banks account.

19         THE COURT:  Can you steal the identity of someone

20  who is deceased?

21         MR. CESSAR:  Oh, yes.  I believe so, yes; yes.

22         THE COURT:  Okay.  So then we'll exclude those

23  out-of-court; I won't give any weight to those.

24         Now, with respect to the cause that the Government

25  is asserting for not calling any of the out-of-court

1    declarants from -- who were employees of Gain Capital, that

2    has to do with their being in New Jersey and the inconvenience

3    of bringing them.  Am I correct in that?

4              MR. CESSAR:  Correct, Your Honor.

5              THE COURT:  And the cost and expense attendant to

6    that as well, and the Court did say that there are certain

7    circumstances where cause doesn't need to be shown, as it's

8    not a per se requirement when the indicia of reliability is

9    overwhelming; and I'm going to find that the indicia of

10   reliability with respect to the Gain Capital is

11   overwhelming --

12             MR. CESSAR:  May I also inquire --

13             THE COURT:  -- given the level of detail, the fact

14   that these documents were produced in response to a subpoena,

15   and that the -- the tape which has Mr. Banks's voice on it.

16             MR. CESSAR:  Just so we're clear, I'm also going to

17   rely upon the statements filed with the Probation Office,

18   Exhibits 10 --

19             THE COURT:  Yes, I don't think those are hearsay in

20   a sense because they're Mr. Banks's own statements.

21             MR. CESSAR:  And also there are the records from

22   Eureka Bank.

23             THE COURT:  And records maintained --

24             MR. CESSAR:  And records from Eureka Bank and

25   Niagra Bank that the agent testified about that were

1   introduced into evidence.

2          THE COURT:  Yes.

3          MR. CESSAR:  I would argue those should be submitted

4   for the same reason as the Gain Capital record.

5          THE COURT:  The only one I have a little problem

6   with there is the Eureka one because it doesn't reference the

7   number of the account on the face and we have to rely on the

8   out-of-court statements made by the employees of Eureka about

9   that.

10          MR. CESSAR:  I can see your point, but I think that

11   document does indicate that Eureka Bank has no accounts

12   related to Mr. Banks.

13          THE COURT:  I understand.

14          MR. CESSAR:  Oh, okay.  Maybe I'm missing something.

15   I'm kind of dense today, but --

16          THE COURT:  Because the accounts that he was

17   referring to -- I'm trying to think where the letter is --

18   what exhibit is that?

19          MR. CESSAR:  That's Exhibit 18.

20          THE COURT:  What is the one that it's relating to?

21   There was the transfers --

22          MR. CESSAR:  It related to Exhibit 7 and in

23   particular it related to the last page --

24          THE COURT:  This is Mr. Cochran.

25          MR. CESSAR:  Correct.

1          THE COURT:  And this is the issue of whether this is

2   really Mr. Banks; so if the question was whether this --

3   that's why I thought it was important to know what number the

4   account on the -- that was --

5          MR. CESSAR:  I think the agent testified that he

6   subpoenaed the bank account, the account in question, and

7   Mr. Pepper from Eureka Bank said his account in question,

8   which was the basis of the subpoena, was closed in 2004.

9          Do you have that exhibit handy, Your Honor?  I can

10  find it for you.  It derives from Exhibit 7, Your Honor.

11         THE COURT:  That's the Eureka; that's the one for

12  Hexagon, LLC.

13         MR. CESSAR:  Correct.  We subpoenaed that account

14  and they refer back that that -- specifically addressed that

15  it was closed in --

16         THE COURT:  Account XXXX-X3252, right?  And so

17  the -- what came back -- what exhibit is that?

18         MR. CESSAR:  Eighteen, Your Honor.

19         THE COURT:  The letter that came back just says as

20  per the attached subpoena request, Eureka Bank has no accounts

21  related to Mr. Banks.  It doesn't specifically mention the

22  account number or Hexagon, LLC.  See, that's the problem.  You

23  have to rely on Eureka Bank's officer.

24         MR. CESSAR:  Okay.

25         THE COURT:  So supply that.

1          MR. CESSAR:  All right.  I would be relying upon
2    that.
3          THE COURT:  Okay.
4          DEFENDANT BANKS:  I'd -- I want to mention something
5    about the recording.
6          THE COURT:  Okay.
7          DEFENDANT BANKS:  We might have to play it again,
8    but the recording doesn't tie -- it doesn't matter if it's my
9    voice or not.  It doesn't say anything about any account going
10   to First Niagra.  It doesn't say anything about any account
11   that I'm opening there.  It doesn't say any of that.  I
12   listened to it very carefully.  This is the second time I
13   heard it, and it doesn't tie Fred Banks, even if that is his
14   voice, to anything.  It's a representative from Michael at
15   Gain Capital or Forex talking to a gentleman, and it doesn't
16   say anything tying that gentleman to any of this at all on
17   that tape.
18         MR. CESSAR:  We'll play the tape, Your Honor.  I
19   mean the tape is the best evidence.  But --
20         DEFENDANT BANKS:  It doesn't say he has an account,
21   it doesn't say anything.  The guy is asking him what you want
22   to trade and he's saying I may trade -- whatever he said.
23         THE COURT:  He has to verify the amounts in the
24   account; and if you can submit the bank statements or
25   something like that --

1          DEFENDANT BANKS:  It doesn't say what bank, it

2   doesn't say anything of that.  And then the statement he's

3   saying that was submitted doesn't have Fred Banks on it.  The

4   bank statement, it doesn't have Fred Banks on it.  It's

5   Exhibit -- right here -- it's blank.  Where is it at --

6          MR. CESSAR:  The person --

7          DEFENDANT BANKS:  What exhibit is that?

8          MR. CESSAR:  The person identifies himself as

9   Freddie Banks.  The account is with Freddie Banks at

10  Gain Capital.

11         THE COURT:  It's not the corporate account.

12         MR. CESSAR:  No, it's Freddie Banks's account.

13         DEFENDANT BANKS:  And on the exhibit -- have it

14  right here; I don't know what number it is, the one with the

15  First Niagra Bank statement.  Nothing on it says Freddie or

16  Frederick; there is no name on the statement.

17         THE COURT:  It has account number 0906.

18         DEFENDANT BANKS:  Right.  But the account number is

19  not mentioned on the tape.  Nothing is tying that tape to

20  this.

21         MR. CESSAR:  I think if you listen --

22         THE COURT:  It's by a preponderance of the evidence,

23  and that's really the --

24         DEFENDANT BANKS:  There's no date on this thing,

25  when it was submitted, on this document; there's no name on

1   this document.  And as a matter of fact, that recording, there

2   is nothing on there that says when the recording was made.

3           MR. CESSAR:  Your Honor, if I can answer his

4   question.

5           THE COURT:  Yes.

6           MR. CESSAR:  Specifically, the representative stated

7   that the bank statement -- the First Niagra statement was

8   needed in order to free up the account and approve the

9   numerous ACH deposits and withdrawals.  Freddie Banks -- and

10  you hear this on the tape -- addressed the Gain Capital

11  representative, stating, quote:  I just got an online

12  statement and copied it and pasted it right to you.  And

13  that's the statement.  That's what's in the --

14          DEFENDANT BANKS:  The problem is we don't have

15  Michael here to verify that.  He's not here to verify

16  anything.  What Michael --

17          THE COURT:  He's saying what Michael said.  We don't

18  have him here.

19          MR. CESSAR:  No we have the tape.

20          DEFENDANT BANKS:  It doesn't tie to that.  We need

21  Michael.

22          (Tape replayed in open court.)

23          MR. BANKS:  I have a problem with that, Your Honor.

24  Nowhere on that tape does it say Banks.  It doesn't say the

25  last name, and it doesn't say First Niagra, and it doesn't say

1   how many million.  It doesn't say that.  It doesn't say

2   anything.  We need Michael here.

3          THE COURT:  Mr. Cessar?

4          MR. CESSAR:  Your Honor, I think it is admissible

5   because the record did show up, we got it pursuant to a

6   subpoena.

7          THE COURT:  The subpoena was for the tape as well?

8          MR. CESSAR:  Yes.  For the tape, everything we got.

9   And that reflects the First Niagra account which we've

10   established is owned by Mr. Banks, the 0906 account,

11   Your Honor.

12          DEFENDANT BANKS:  I just can't agree.  It doesn't

13   even say the last name.  It -- nowhere on it does it state

14   First Niagra.  Freddie is what it says; I just listened to it.

15   There's not even a bank on that.

16          THE COURT:  That's your voice on it, Mr. Banks.  So

17   it says Freddie and we know you're Mr. Banks.  So -- I don't

18   think that's a problem.

19          When I look at the totality of the evidence with

20   respect to the Gain Capital situation, that there were

21   subpoenas issued for these records, for this document, we have

22   Mr. Banks's voice on the tape saying that he sent an online

23   statement, that the online statement that was produced is as a

24   result of the subpoena, is the First Niagra statement.  It

25   does tie back to a bank account that Mr. Banks himself has

1   acknowledged is a bank account in his name.  That's sufficient

2   for the Court in terms of establishing reliability.  And I

3   think that's overwhelming.  So under that basis we will

4   proceed.

5           MR. CESSAR:  Thank you, Your Honor.

6           THE COURT:  But I also have to first -- I want to go

7   back and I want to eliminate anything that the Court's

8   required to do under Federal Rule of Criminal Procedure 32.1.

9           The Court notes that the Court has to hold a

10  revocation hearing within a reasonable time, and that the

11  person is entitled to -- these are the following rights:  A

12  written notice of the alleged violation which we have here,

13  which is the initial petition; two, a disclosure of the

14  evidence against the person, which we have had here in court

15  today and also it was reflected in the description of the

16  violation; and Part C is an opportunity to appear.  Mr. Banks

17  is here to present evidence, he's had an opportunity to do

18  that; and question any adverse witness unless the Court

19  determines that the interest of justice does not require the

20  witness to appear, and that's the finding that the Court made

21  with respect to any representatives from Gain Capital.  I

22  didn't find the same with respect to Mr. Cameron or the

23  Eureka -- the officer from Eureka who was identifying the

24  specific account in question.

25          And the next item is the notice of -- the next right

1   is the notice of the person's right to retain counsel or to

2   request that counsel be appointed if the person cannot obtain

3   counsel; and the Court went through that today with -- with

4   Mr. Banks in the colloquy.  And the last one is an opportunity

5   to make a statement and present any information in mitigation.

6           So, Mr. Banks, I'm going to also permit you an

7   opportunity to make a statement and present any information in

8   mitigation.

9           DEFENDANT BANKS:  On that particular point you just

10  talked about?

11          THE COURT:  With respect to the revocation.

12          DEFENDANT BANKS:  Okay, because I have an objection

13  on that because on the advance written notice prong I

14  received, you know, I spoke with you before through the

15  pleadings about process on the arrest warrant.  I was never

16  served a copy of the arrest warrant.  I never received any

17  kind of notice, the petitions, none of that.  It's supposed to

18  be -- under Morrisey versus Brewer, advance written notice,

19  and I didn't receive any of that.

20          THE COURT:  You did not receive the petition for

21  revocation?

22          DEFENDANT BANKS:  I received nothing until the

23  hearing -- it's at every stage of the proceeding.  I went to

24  the Magistrate Judge; I didn't have it until I got into the

25  courtroom.  It has to be, I think, at least 48 hours in

1   advance.   I never received anything in the arrest warrants;

2   they were never even served.   That's process.   Here's a link.

3   The process of the arrest warrant gives you the authority --

4          THE COURT:   The arrest warrant doesn't have to be

5   served.   The warrant authorizes the officer to arrest you and

6   bring you in.   And when that happens, then you're entitled to

7   a prompt hearing before a Magistrate Judge.   It says that you

8   have to have an initial appearance, and I believe you did have

9   your initial appearance; is that correct?

10          DEFENDANT BANKS:   Under American jurisprudence

11   process, that arrest warrant is process.   It has to be served

12   on me.   It was never served.   I still don't have a copy of it.

13          THE COURT:   What's your authority for that?

14          DEFENDANT BANKS:   American jurisprudence under

15   the -- there's a book process that talks all about it.   That's

16   what gives you the authority to act.   Just like a summons, an

17   arrest warrant is sent out.   They bring it to me and they can

18   give me a copy of it and that's service.

19          THE COURT:   That's not my understanding of the law.

20          MR. CESSAR:   This is a supervised release violation,

21   Your Honor.   There's no separate arrest warrant.   I believe

22   that the Court signs the petition for the supervised release

23   and orders the writ.

24          THE COURT:   And I authorize the issuance of a

25   warrant.

1        MR. CESSAR:  Yes.

2        THE COURT:  I believe that's what happened here.

3   There is a petition for warrant.

4        DEFENDANT BANKS:  Right.  And the warrant is what

5   kept me in jail because there was no bond set on the warrants.

6   They were never even served on me, and I never received a copy

7   of the petition, which is sort of like the affidavits that's

8   attached to the warrant.  I never got that until I was well

9   into that hearing at the Magistrate.  Never received it.

10  That's not advance written notice under Morrisey versus

11  Brewer.  It's not just notice, it's advance notice.

12       MR. CESSAR:  How can you give somebody advance

13  notice when you're going to arrest them?

14       DEFENDANT BANKS:  How can you --

15       MR. CESSAR:  May I finish?  I've been accommodating

16  to you, I've respected you -- he had a prompt initial

17  appearance at -- before a Magistrate provided to him, then we

18  had the preliminary examination.  This was all laid out and

19  that was several weeks ago and now we're here.

20       THE COURT:  And there was a finding of probable

21  cause at that time.

22       MR. CESSAR:  Correct, correct.

23       THE COURT:  Okay.  And the hearing today is not a

24  probable cause hearing.  The hearing today is to determine

25  whether there has been evidence presented by the Government to

1    prove by a preponderance of the evidence that the Defendant

2    committed the crimes of wire fraud and/or aggravated identity

3    theft.

4         MR. CESSAR:  Your Honor, I've just been handed the

5    warrant for the arrest that was served by a Deputy US Marshal.

6    So --

7         DEFENDANT BANKS:  I never got it.  I never got any

8    of the petitions until the hearing we were at, Your Honor, the

9    hearing that -- when you ordered competency, that's the first

10   time I ever saw the motion.  Under Morrisey versus Brewer

11   that's not advance written notice.  I had -- I had -- I had --

12   I was supposed to receive that, those petitions at every stage

13   of the proceeding, not when I get into the courtroom.

14        They knew I was at the jail, they knew where I was

15   arrested.  They could have sent them.  They could have sent it

16   up through Mr. Nightingale.  Again, they could have mailed it

17   to me, fax'd it up there.  I never got it until I was well

18   into the hearing, and I didn't get it until I was in the

19   second hearing with you, never got it.

20        MR. CESSAR:  I can clear this up by calling the US

21   probation officer who will testify he was provided those

22   documents at the initial appearance.

23        MR. BANKS:  Even -- even if you call him up here to

24   say that, that doesn't even matter.  I was supposed to get

25   them in advance.

1        THE COURT:  Where is the requirement for advance?

2   It says you have to have written notice.  This would be --

3        DEFENDANT BANKS:  I'll find it.  Let me give you one

4   second of that; I believe I have it right here.  And it's

5   in -- I believe it's --

6        THE COURT:  It's like an indictment, written notice

7   of the alleged violations, sort of akin to an indictment.  As

8   long as you get notice of that and time for the hearing --

9        DEFENDANT BANKS:  It's a little bit different.

10  Morrissey versus Brewer is actual notice, and actual notice

11  doesn't happen when you're halfway into a hearing.  That

12  doesn't happen --

13        THE COURT:  I think you had this.  I note prior to

14  the start of this hearing --

15        MR. CESSAR:  At his initial appearance, Your Honor.

16  And that's the first step in the process.  When somebody is

17  indicted, one of the questions the Magistrate always ask is do

18  you have a copy -- at the initial, do you have a copy of the

19  indictment?  Do you want me to read it to you?  So that's the

20  starting event.

21        DEFENDANT BANKS:  This is straight out of -- it's

22  actually one of my motions, too, that I put into the court.  I

23  talked about -- all about it.

24        THE COURT:  Morrissey versus Brewer, Page 486 and

25  487 of 40 -- I think it's 408 US 1972.  The Court says with

1  respect to the preliminary hearing before this officer -- I

2  think they're referring to the --

3          MR. CESSAR:  -- Magistrate Judge.

4          THE COURT:  -- the Magistrate Judge's hearing, that

5  parolees should be given notice that the hearing will take

6  place and that its purpose is to determine whether there's

7  probable cause to believe he has committed a parole violation.

8  The notice should state what parole violations have been

9  alleged at the hearing.  The parolee may appear and speak on

10 his own behalf, bring letters, et cetera, et cetera.

11         And that at the revocation hearing it says there

12 must also be an opportunity for a hearing if it is desired by

13 the parolee prior to the final decision on revocation by the

14 parole authority.  This hearing must be the basis for more

15 than determining probable cause.  It must lead to a final

16 evaluation of any contested relevant facts and consideration

17 of whether the facts as determined warrant revocation.  The

18 parolee must have an opportunity to be heard and to show if he

19 can that he did not violate the conditions or if he did what

20 circumstances in mitigation suggest that the violation does

21 not warrant revocation.

22         DEFENDANT BANKS:  It's contained in -- it's American

23 Jurisprudence under parole and pardon.  And parole is the

24 section that talks about it.  And --

25         THE COURT:  Who was present -- was the probation

B. Orrison - Direct

1    officer present at the hearing, the preliminary hearing?

2           MR. CESSAR:  May I -- do you want to address him

3    directly, Your Honor, or through me on the stand --

4           THE COURT:  He has to come on the stand so he can be

5    cross-examined.

6           MR. CESSAR:  The Government calls probation officer

7    Ben Orrison.

8           THE COURT:  He has already been put under oath.

9           I remind you, you remain under oath.

10                          * * * * *

11          BEN ORRISON, a witness herein, having been

12   previously duly sworn, was examined and testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. CESSAR:

15   Q      Sir, as you previously stated, you are the probation

16   officer supervising Mr. Frederick Banks, correct?

17   A      That's correct.

18   Q      And you authored the two petitions seeking to revoke

19   his supervised release?

20   A      That's correct.

21   Q      And were you present when Mr. Banks was arrested?

22   A      I was.

23   Q      And were you present at his initial appearance?

24   A      I was.

25   Q      And at that time did he have copies of the petitions

1   that you prepared and filed?

2   A       They were not the official signed ones by the judge

3   because they were still under seal, but they were -- he was

4   provided with a copy of the petition of supervised release.

5   Q       And do those petitions set out all of the facts and

6   allegations underlying the revocation?

7   A       They do.

8           MR. CESSAR:  No further questions, Your Honor.

9           DEFENDANT BANKS:  That's in the -- my argument is I

10  didn't get it in advance.  There's authority for that and it's

11  contained in there, but I can't find it right now.

12          MR. CESSAR:  May I make a point, Your Honor?

13          THE COURT:  Yes.

14          MR. CESSAR:  He's on supervised release, not parole.

15  So -- maybe too fine of a technical point, but the -- just to

16  bring that up for your consideration.  I'm not sure Morrissey

17  would apply in the supervised release setting versus the

18  parole setting, whether the two are analogous, but --

19          THE COURT:  I haven't had a chance; this is coming

20  up for the first time right now, so I --

21          MR. CESSAR:  I agree.

22          THE COURT:  I haven't had an opportunity to do any

23  thorough analysis of this.

24          MR. CESSAR:  I'm impressed your clerk was able to

25  get that so quickly.

1      THE COURT:  Yes.  Given the time today, I --
2  unfortunately, I thought we would be finished with this, but
3  we've had other issues.  Mr. Banks, do you have any other
4  issues that you need the Court to look at?  Because we're
5  going to have to continue this.  I just want to make sure
6  everyone is prepared.
7      DEFENDANT BANKS:  None that I can think of right
8  now.  I mean just --
9      THE COURT:  So your argument is that you should have
10  had advance notice.
11      DEFENDANT BANKS:  Advance written notice of the
12  hearing -- of the hearing and the petition.  I didn't get the
13  arrest warrant, the petition.  I think the arrest warrant is
14  process.
15      THE COURT:  What?
16      DEFENDANT BANKS:  The arrest warrant, I think it's
17  process.
18      THE COURT:  The arrest warrant.
19      DEFENDANT BANKS:  It had to be served on me; it was
20  never served.
21      THE COURT:  That's one issue, whether the arrest
22  warrant needs to be served.
23      DEFENDANT BANKS:  It was never returned to the
24  docket.  There is a return thing on the arrest warrant.
25  They're supposed to return that to the docket.  That was not

1    returned and I never received advance written notice of the

2    petition.  I got -- I got the petitions, I agree with him,

3    what he's saying, but I'm saying I was supposed to have

4    advance written notice of the petitions.

5           THE COURT:  But I asked you earlier today if you

6    were aware of the -- what the charged violations were and we

7    went over those and you said you were aware of those.

8           DEFENDANT BANKS:  Yes, I am aware.  What I'm saying

9    is I didn't have -- I didn't -- I wasn't aware of them before

10   I got in the courtroom.  And under the law you're supposed to

11   have --

12          THE COURT:  You were aware of them when you were at

13   your -- at the initial appearance, though.

14          DEFENDANT BANKS:  When we spoke on them, yeah,

15   that's the first time I became aware of them.  But not before;

16   it's advance written notice, it's not when you get there

17   you -- here you are.  I'm proceeding pro se.  I'm representing

18   myself.  I had a right to have that in advance.

19          THE COURT:  This would vitiate the whole process and

20   procedure that we have in the Federal Courts when people are

21   arrested and brought in for their initial appearance.  That's

22   when they receive notice of what the charges are and you have

23   a Magistrate Judge to review those with you.  So if you have

24   any authority for your position that it has to be in advance

25   and you actually have to be served with the arrest warrant,

1    I'll give you an opportunity to present that and the

2    Government can respond if there's -- I'm just not -- I don't

3    see that requirement.  I think you do need to give notice

4    about what the charges are so that you can defend against

5    them.  You knew that at the initial appearance.

6             DEFENDANT BANKS:  Yeah.

7             THE COURT:  And then we had the hearing that began

8    in October, then we had to have the time for the competency

9    evaluation, and now we're continuing today.  So there's

10   certainly been time --

11            DEFENDANT BANKS:  I'm sorry, Your Honor, sorry to

12   interrupt you.

13            THE COURT:  Go ahead.

14            DEFENDANT BANKS:  I just remember what happened.  I

15   didn't get the petition and the supplemental petition until we

16   got to the second hearing, which was -- that's when you

17   ordered a competency and we had part of the competency

18   hearing.  What happened was I was prevented -- I had the

19   exhibits from the Government.  Next thing I know they were

20   taken out of my hand.  I went to try to get them from -- I

21   talked about this on the record.  I tried to get them from

22   Mr. Cessar, and I was prevented from getting the -- the

23   petition.  That's why I never had those exhibits with the

24   petitions.

25            I was right up here.  As soon as you left the

1  courtroom, I was prevented from getting them.  He took them

2  from me.

3          MR. CESSAR:  Your Honor, if I can respond --

4          DEFENDANT BANKS:  He took them.

5          MR. CESSAR:  If I can respond.

6          DEFENDANT BANKS:  And I put it all in these

7  pleadings.

8          THE COURT:  Okay.

9          MR. CESSAR:  Okay.  I -- I'm an officer of the

10  court, and that's incorrect.  And, in fact, I provided a

11  scanned copy to Mr. Nightingale of all the exhibits from that

12  first pleading a day or two after to make sure he had a

13  complete set.  So I did not take --

14          THE COURT:  Mr. Nightingale, did you receive such

15  documents?

16          MR. NIGHTINGALE:  Yes, I did, and I mailed them to

17  Mr. Banks.

18          MR. CESSAR:  Your Honor, where this is coming from,

19  I don't know.  I operated in good faith.  I've provided him

20  with ample opportunity of all the exhibits and I'm letting him

21  look at his pleadings.  This is coming out of left field.

22  More importantly, we have a witness, the probation officer in

23  this case, that says Mr. Banks was provided with the petition

24  at his initial appearance.  That initial appearance was --

25  four weeks ago.  He's had plenty of notice of what's going on

1    here today.  He's had the exhibits.  He's had everything and

2    I -- these tactics are getting to the point --

3            THE COURT:  I understand.  But on the other hand, he

4    is entitled to make a record.  I have to rule on these issues.

5    It's sometimes a process that we need to get through.

6            MR. CESSAR:  And believe me, I agree with you a

7    hundred percent.  You do it right, as you're doing it right

8    now, and we will all get to the place where we need to be.  So

9    I'm not in any way suggesting that we need to cut any corners.

10           THE COURT:  Okay.  I just don't want to rule on

11   things on the fly and then --

12           MR. CESSAR:  I agree.

13           THE COURT:  Sometimes you just have to make sure you

14   have the right standards and then see how they apply here.

15           MR. CESSAR:  Hundred percent agreement, Your Honor.

16           THE COURT:  Okay.

17           DEFENDANT BANKS:  Your Honor, I agree with what

18   you're saying.  I'm not trying to waste the Court's time.  I

19   would just -- I don't know if you're getting a chance to read

20   everything I'm submitting.  I would like you to read my

21   pleadings because clearly in these pleadings I stated that I

22   had -- I had the exhibits.  This is not the ones he mailed.

23   What happened was this:  This is at the hearing we had where

24   you ordered a competency --

25           THE COURT:  Yes.

1        DEFENDANT BANKS:  As soon as you turned your back

2   and left this courtroom, he snatched the exhibits.  I turned

3   to try to retrieve them and they were held from me.  So then I

4   filed in court, to your court, letting you know I don't have

5   the exhibits and that's what happened.  As a result, he was

6   providing the exhibits from the US attorney who mailed them to

7   me.

8        THE COURT:  But you did get them.

9        DEFENDANT BANKS:  I -- I was given them at your

10   hearing and then they -- as soon as you left the courtroom.

11        THE COURT:  I mean at this stage we need to -- I

12   have to adjourn this hearing today.  I would like to reconvene

13   next Monday afternoon at two o'clock.  I don't think this

14   should take much longer.  I think the issues are going to be

15   what kind of notice was required.  I want to direct a copy --

16   I would like to receive a copy if we can get it in that short

17   a period of time of the transcript of the arraignment hearing

18   before the Magistrate, and then we'll hear from you; and if

19   there's any further statement you want to make, you can do so

20   and I'll hear the argument about the -- whether or not there's

21   been sufficient evidence adduced.

22        DEFENDANT BANKS:  I'd like to move for bail because

23   we discussed last time I have -- I have a housing hearing

24   tomorrow, and Mr. Nightingale stated that he contacted the

25   judge in that -- in that proceeding and also the counsel, but

1   he has no idea what happened, if it was continued or not.  I'm

2   supposed to be in front of a state court tomorrow and remember

3   we -- we spoke to you -- I spoke to you last time and you

4   said, well, when is the date on that?  I said the 21st.  You

5   said, well, this hearing is on the 20th.

6            So I would like to move for bail.  I don't even know

7   why I was prevented from getting bail because, as you know,

8   I've always showed up, I'm not a flight risk, and I'm not a

9   danger.  I've also showed up for every hearing I ever had.

10  Every time Ben called me into the Probation Office I've always

11  appeared.  I never ran from anything.  I don't even know why

12  no -- no bond was set on the arrest warrant that I never

13  received.  I was supposed to have an opportunity to have a

14  bond hearing at the Magistrate level.  I never got that.  I'm

15  sitting up here in jail in Youngstown when I got housing

16  issues --

17            THE COURT:  I think the risk is that you were

18  engaged in these transactions and there was a concern that you

19  would continue to do so.  And that's the reason.  I was the

20  one that signed the warrant with no bond because of the

21  serious nature of these allegations.

22            DEFENDANT BANKS:  A danger -- we're not talking

23  about a drug case or somebody has a gun or somebody is going

24  to kill.  This is a white collar case.  I'm obviously not a

25  flight risk.  I was in Europe under indictment and I came all

1   the way back.  The FBI told me I could go.  I came back.  That

2   was in the Hardiman era; I never missed a court appearance, so

3   that's flight risk.

4          Danger, I'm not dangerous.  You have procedures you

5   can put in place to say if you do this, we're going to violate

6   you.  House arrest, something.  I need to get back out there.

7   I never had an opportunity to have a hearing.  I never even

8   knew there was no bond set.  I still to this day -- in this US

9   District Court I still don't have those arrest warrants.

10  That's not process.  And that's where it says no bond set.

11  That's another reason I had to have it, because I had to have

12  an opportunity to know there's not going to be a bail hearing

13  on this, because it's in the arrest warrant.  That's one

14  reason I needed to get served with them.  I still don't have

15  them to this day.

16         THE COURT:  What I'm going to do is check to see who

17  the Magistrate is on duty and we'll send you down for the bail

18  hearing today, okay?

19         MR. CESSAR:  The issue, though, however, I believe

20  is Judge Fischer -- is there a bond in Judge Fischer's?

21         PO ORRISON:  I believe no bond was set in

22  Judge Fischer's.

23         MR. CESSAR:  We'll have to reprise this all before

24  Judge Fischer -- I'm just laying that out.

25         THE COURT:  Well, there is a bond hearing and we can

1    see if -- we'll check with Judge Fischer, if she wants to

2    refer him back for a bail hearing before the Magistrate Judge

3    today as well.

4                THE DEFENDANT BANKS:  What I'm saying is it's a

5    Catch-22.  It doesn't become moot because Judge Fischer stayed

6    her case pending the outcome of your decision.  So I think --

7                THE COURT:  She still has a separate warrant out

8    there --

9                DEFENDANT BANKS:  Right.

10               THE COURT:  -- that has to be dealt with.

11               DEFENDANT BANKS:  Right, but I'm saying both issues

12   have to be dealt with --

13               THE COURT:  I am suggesting that we see if she wants

14   to refer this matter for a bail hearing down to the Magistrate

15   Judge.  Okay?

16               DEFENDANT BANKS:  There has to be two bail

17   hearings --

18               THE COURT:  No, together, that's what I said.  That

19   was my suggestion, that we refer down to the Magistrate Judge

20   for a bail hearing.

21               MR. CESSAR:  That's why I raised it with you, so we

22   can --

23               THE COURT:  -- move it on.  Okay.  So we will do

24   that.  So we're going to see if the Magistrate Judge -- we

25   have a duty magistrate, should hopefully be able to hear that

1    this afternoon, promptly.

2            MR. CESSAR:  I'm not sure of the procedure,

3    Your Honor.  And -- there will be an order directing the

4    Magistrate Judge to review the bond?  Because I don't think

5    they can override what you've already set, just the mechanics.

6            THE COURT:  Oh, I am -- that's what I'm going to

7    say.  I'm going to refer it down to the Magistrate Judge to

8    have a de novo hearing on whether or not bail should be set.

9    Okay?  And we have -- the probation officer is here, so -- we

10   can go there.

11           Anything further?  Okay.  So we'll be back here

12   Monday at two and then there will be a separate bail hearing

13   as soon as practicable.  Okay?

14           DEFENDANT BANKS:  Just one more thing, I'm sorry.

15   Exhibit Capital One, the back side, you can't tell from this

16   that it wasn't -- that it was a prepaid card.

17           THE COURT:  Well, they've removed that anyway.  It

18   may be relevant for Judge Fischer's situation, but at least in

19   this case that supplemental petition has been withdrawn.

20           DEFENDANT BANKS:  All they would have to do is call

21   and they'll say it's a prepaid card.

22           THE COURT:  Okay, thank you.

23           DEFENDANT BANKS:  Your Honor, are we doing that bail

24   hearing forthwith today?

25           THE COURT:  I hope.  So we'll know in just a few

1  minutes, as soon as we can get in touch with the Magistrate,

2  and I need to check with Judge Fischer to see if she is

3  amenable to making a referral as well.  Thank you.

4          (Hearing concluded at 3:20 p.m.)

5

6              C E R T I F I C A T E

7  I, Shirley Ann Hall, certify that the foregoing is a correct

8  transcript for the record of proceedings in the above-titled

9  matter.

10

11

12                    s/Shirley Ann Hall
                    Shirley Ann Hall, RDR, CRR
13                    Official Court Reporter

14

15              I N D E X

16              * * * * *

17  WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

18  Robert Wettstein          8     11      --       --

19  Sean Langford            34     76      86       88

20  Ben Orrison              90     96     104      105

21                          135     --     ---      ---

22

23

24

25